## UNITED STATES *v.* ERIE RAILROAD COMPANY.

ERROR TO THE UNITED STATES CIRCUIT COURT OF AP-
PEALS FOR THE THIRD CIRCUIT.

No. 580.   Argued December 18, 1915.—Decided May 3, 1915.

Railroad yards belonging to the same railroad but several miles apart,
such as those of the Erie Railroad at Jersey City, Weehawken and
Bergen, although important accessories of the same terminal are
not actually one yard, and trains moving between them are not
engaged merely in switching operations, but are engaged in trans-
portation within the purview of the air-brake provisions of the
Safety Appliance Act.

212 Fed. Rep. 853, reversed.

THE facts, which involve the construction and appli-
cation of the Safety Appliance Acts, are stated in the
opinion.

*Mr. Assistant Attorney-General Underwood* for the
United States.

*Mr. George S. Hobart* and *Mr. Gilbert Collins* for defend-
ant in error.

MR. JUSTICE VAN DEVANTER delivered the opinion
of the court.

This was a civil action by the United States to recover
from the Erie Railroad Company a penalty for each of

several alleged violations of the Safety Appliance Act of March 2, 1893, c. 196, 27 Stat. 531, as amended and supplemented by the acts of April 1, 1896, c. 87, 29 Stat. 85; March 2, 1903, c. 976, 32 Stat. 943; and April 14, 1910, c. 160, 36 Stat. 298.

The declaration contained twenty-six counts. The first seven were based upon the use of that number of cars having defective couplers, the eighth upon the use of a car without grab irons or handholds at one end, and the remaining eighteen upon the operation of that number of transfer trains in which less than eighty-five per cent. of the cars were controlled by air brakes. All of these acts were charged as having occurred in January and February, 1911, on the defendant's railroad while it was being used and operated in moving interstate traffic. The plea interposed was the general issue.

The case was tried twice. The first trial resulted in a judgment for the Government which was reversed by the Circuit Court of Appeals. 197 Fed. Rep. 287. At the second trial there was a directed verdict for the defendant and the judgment thereon was affirmed by that court. 212 Fed. Rep. 853. This writ of error challenges the judgment of affirmance.

There was no real conflict in the evidence, the material facts being as follows: The defendant operates an interstate railroad extending from New York City via New Jersey to Buffalo and Chicago. In that connection it maintains railroad yards, with docks for ferries and floats, on the west bank of the Hudson River, at Jersey City and Weehawken, where cars are received from and forwarded to various points around New York Harbor; and it maintains another yard at Bergen—inland two miles from Jersey City and three and one-half miles from Weehawken—where cars are received from and forwarded to western points. In the Jersey City yard there are 60 tracks, in the Weehawken yard 80 and in the Bergen

yard 115.  Between the Bergen yard and the others is a
hill about 250 feet high, which is pierced by a tunnel al-
most a mile in length.  The three yards are connected by
double tracks extending from Jersey City and Weehawken
to the eastern portal of the tunnel and then passing
through the tunnel to Bergen.  The situation may be
illustrated by treating the three yards as located at the
outer points of the letter Y—Weehawken and Jersey
City at the upper points and Bergen at the base—and
connected by tracks conforming to the lines of that letter,
the tunnel being along part of the lower line.  The con-
necting tracks are not used by passenger trains but are
the main tracks over which freight is moved from and to
points around New York Harbor.  Jersey City, Wee-
hawken and Bergen are all stations at which freight, both
local and interstate, is accepted and delivered, and are
so shown in the defendant's tariff schedules.  While the
yards at these places are all used for receiving, storing,
handling and forwarding cars, the work of classifying,
distributing and assembling the cars preparatory to send-
ing them to their ultimate destinations, west and east,
is principally done in the Bergen yard.  Most of the
regular west-bound freight trains are made up and started
in that yard and most of the regular east-bound freight
trains are stopped and broken up there.  Some regular
trains carrying high-class freight pass Bergen without
more than a temporary stop, but the greater part of the
traffic is moved between the yards at Jersey City and
Weehawken and the one at Bergen in transfer trains
which only run between those yards and are operated over
the double tracks before described.  These transfer trains
usually have about twenty-five cars, do not carry a
caboose, are drawn and operated by engines and crews
specially engaged in that service, and have flags and
signal lights differing somewhat from those on other
trains but answering the same purpose.  They are not

run according to fixed schedules but at irregular intervals under the orders of yard masters and according to block signals. Their speed is from seven to eighteen miles an hour and they move great numbers of cars in each direction every day. All go through the tunnel, which is admitted to be very dark, and upon each trip they pass over several switches leading to other tracks, traverse part of the same line over which fifteen regular through and local freight trains are moved each day, and cross at grade tracks which are in daily use by approximately thirty-five passenger trains.

The cars named in the first eight counts of the declaration were defective in the particulars charged and while thus defective were hauled—six from Jersey City to Bergen and two from Weehawken to Bergen—in transfer trains along with other cars in commercial use. All of the defects were discovered in the yards from which the cars were moved and those in six of the cars could have been readily repaired in those yards by the local force of car repairers, consisting of seven men at Jersey City and five at Weehawken. The defects in two of the cars were serious and as to them Bergen may have been the nearest available point for making the necessary repairs. These cars were hauled by means of chains instead of draw-bars and there was no claim that they contained live stock or perishable freight.

The transfer trains named in the remaining eighteen counts were hauled—nine from Jersey City to Bergen, two from Weehawken to Bergen, one from Bergen to Jersey City and six from Bergen to Weehawken—without the requisite number of air brakes being in use or connected for use. On fourteen of these trains there was no attempt to connect any of the air brakes and on the remaining four less than 55 per cent. were connected. Brakemen were required to be on the cars and in some instances rode on the tops of box cars pursuant to a rule

of the defendant. No cars were switched out of or into these trains while they were on the way from one yard to the other.

The Circuit Court of Appeals rested its judgment upon the conclusions (a) that the three yards are not separate or distinct, but with the connecting tracks constitute a single and extensive yard, (b) that the movements of the transfer trains from Jersey City and Weehawken to Bergen and *vice versa* were mere switching operations and therefore not within the air-brake provision in the statute, and (c) that it was permissible under the statute to haul the cars with defective equipment in the circumstances disclosed.

We cannot assent to the view that the yards at Jersey City, Weehawken and Bergen are but a single yard. They doubtless are important accessories to the defendant's eastern terminal, but that does not make them one yard. They lie from two to three and one-half miles apart, are not so linked together that cars may be moved from one to another with the freedom which is usual and essential in intra-yard movements, and are in actual practice treated as separate yards.

The original Safety Appliance Act is entitled "An Act to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes." The first section makes it unlawful, among other things, for a railroad company engaged in interstate commerce "to run any train" in such commerce without having a sufficient number of the cars so equipped with train brakes—commonly spoken of as air brakes—that the engineer on the locomotive can control the speed of the train "without requiring brakemen to use the common hand brake for that purpose." The second section pro-

hibits such a carrier from hauling or using on its line in moving interstate traffic any car not equipped with couplers which can be coupled and uncoupled automatically "without the necessity of men going between the ends of the cars;" and the fourth section forbids the use in interstate commerce of any car not provided with secure grab irons or handholds in the ends and sides of the car "for greater security to men in coupling and uncoupling cars." The sixth section imposes for every violation of the act a penalty of $100, to be recovered by suit. The act of 1903, by its first section, provides that the requirements of the original act respecting train brakes, automatic couplers and grab irons shall be held to apply to "all trains" and cars "used on any railroad engaged in interstate commerce," unless falling within a minor exception without bearing here. By its second section this act requires that not less than 50 per cent. of the cars in a train shall have their train brakes used and operated by the engineer on the locomotive, confers upon the Interstate Commerce Commission authority to increase this minimum percentage to the end that the objects intended may be more fully accomplished, and makes the penal provision before named applicable to violations of the requirement as enlarged by the Commission. By an order promulgated June 6, 1910, and becoming effective September 1, following, the Commission increased the minimum number of cars whose train brakes must be under the engineer's control to 85 per cent.

It will be perceived that the air-brake provision deals with running a train, while the other requirements relate to hauling or using a car. In one a train is the unit and in the other a car. As the context shows, a train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the

air-brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains and whereby incoming trains which have completed their run are broken up. These are not train movements but mere switching operations, and so are not within the air-brake provision. The other provisions calling for automatic couplers and grab irons are of broader application and embrace switching operations as well as train movements, for both involve a hauling or using of cars. *Johnson* v. *Southern Pacific Co.,* 196 U. S. 1; *Schlemmer* v. *Buffalo Ry.,* 205 U. S. 1; *S. C.,* 220 U. S. 590; *St. Louis, I. Mtn. &c. Railway* v. *Taylor,* 210 U. S. 281; *Chi., B. & Q. Ry.* v. *United States,* 220 U. S. 559; *Delk* v. *St. Louis &c. R. R., Id.,* 580; *Southern Railway* v. *United States,* 222 U. S. 20, 22; *Chicago &c. Ry.* v. *King, Id.,* 222; *Southern Railway* v. *Crockett,* 234 U. S. 725; *Minn. &. St. Paul Ry.* v. *Popplar, ante,* p. 369.

We are persuaded that the transfer trains moving from Jersey City and Weehawken to Bergen and *vice versa* came within the purview of the air-brake provision. They were made up in yards like other trains and then proceeded to their destinations over main-line tracks used by other freight trains, both through and local. They were not moving cars about in a yard or on tracks set apart for switching operations, but were engaged in main-line transportation, and this in circumstances where they had to pass through a dark tunnel, over switches leading to other tracks and across passenger tracks whereon trains were frequently moving. Thus it is plain that, in common with other trains using the same main-line tracks, they were exposed to hazards which made it essential that appliances be at hand for readily and quickly checking or controlling their movements. The original act prescribed that these appliances should consist of air brakes controlled by the engineer on the locomotive, and the act of 1903 declared that this requirement should

"be held to apply to all trains." We therefore conclude and hold that it embraced these transfer trains. Its applicability to this class of trains was considered and sustained in *Atchison, Topeka & Santa Fe Ry.* v. *United States,* 198 Fed. Rep. 637; *United States* v. *Grand Trunk Ry.,* 203 Fed. Rep. 775; *United States* v. *Pere Marquette Railroad,* 211 Fed. Rep. 220; and *La Mere* v. *Railway Transfer Co.,* 125 Minnesota, 159.

The hauling of the cars with defective equipment was clearly in contravention of the statute. While § 4 of the act of 1910 permits such cars to be hauled, without liability for the statutory penalty, from the place where the defects are discovered to the nearest available point for making repairs, it distinctly excludes from this permission all cars which can be repaired at the place where they are found to be defective, and also declares that nothing therein shall be construed to permit the hauling of defective cars "by means of chains instead of drawbars" in association with other cars in commercial use, unless the defective cars "contain livestock or 'perishable freight.'" Six of the cars that were hauled while their equipment was defective could have been readily repaired at the place where the defects were discovered, which was before the hauling began. The remaining two were hauled by means of chains instead of drawbars in association with other cars in commercial use, and it is not claimed that they contained livestock or perishable freight.

It follows that the District Court erred in directing a verdict for the defendant and the Circuit Court of Appeals erred in sustaining that ruling. The judgments of both courts must therefore be reversed and the case remanded to the District Court for a new trial.

*It is so ordered.*