### GREAT NORTHERN RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. April 21, 1924.)

No. 4174.

Railroads ⬯229—Operation by switching crew held "train movement," rather than "switching operation."

Where switching crew picked up a number of cars and took them more than 8,000 feet, from one yard to another, crossing a main-line passenger and east-bound freight track, and several town streets, *held*, that there was a "train movement" rather than a "switching operation," within the Safety Appliance Act (Comp. St. §§ 8613–8615) and order of Inter-

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

state Commerce Commission requiring train to be operated with power or train brakes.

In Error to the District Court of the United States for the Northern Division of the Eastern District of Washington; J. Stanley Webster, Judge.

Action by the United States against the Great Northern Railway Company. Judgment for the United States, and defendant brings error. Affirmed.

Charles S. Albert and Ernest E. Sargeant, both of Spokane, Wash., for plaintiff in error.

Frank R. Jeffrey, U. S. Atty., and H. Sylvester Garvin, Asst. U. S. Atty., both of Spokane, Wash., and M. C. List, Sp. Asst. U. S. Atty., of Washington, D. C.

Before ROSS, HUNT, and RUDKIN, Circuit Judges.

HUNT, Circuit Judge. The plaintiff in error, railway company, asks reversal of a judgment in favor of the United States, rendered as a consequence of sustaining a demurrer to the answer of the railway company in an action alleging two violations of the power or train brake provision of the Safety Appliance Act and the order of the Interstate Commerce Commission, providing that all railroads used in interstate commerce, whenever any train is operated with power or train brakes, not less than 85 per cent. of such train shall have the brakes used and operated by the engineer of the locomotive drawing such train. 32 Stat. 943 (Comp. St. §§ 8613–8615).

The complaint alleges that in May, 1923, the railway company operated a certain transfer train on its line of railroad from Appleyard, Wash., toward Wenatchee, and that the train was operated with power or train brakes, and that none of the cars therein, except the locomotive, had their brakes used and operated by the engineer. The pleadings and map show substantially these facts:

Between the west and east yards at Wenatchee there is one main line; but there is a track known as the west-bound lead or switching lead, used for the purpose of switching cars back and forth between the two portions of the yard, and also for the purpose of moving west-bound through freight trains thereon. That part of the yard on the west was known as the old yard, and the part on the east was known as Appleyard. At the east end cars were made up into freight trains, and the yard on the west was used for the purpose of switching to various industries located near said yard and for storing and icing cars. There is also an industry track, known as the alley track, over which the railway company serves various industries located thereon. The cars described in the pleadings were broken out of the freight trains in the yard on the east, and with contents were placed at various points alongside of the business houses to which the contents were consigned in Wenatchee. A "switch engine," with a "switch foreman" and "switching crew," went to the portion of the yard on the east, and there, after connecting the cars heretofore referred to, some six in number, the locomotive with its six cars left

that part of the yard on the east and went over the west-bound lead to the yard on the west, a distance of approximately 8,000 feet.

The train entered the east yard and proceeded to the freight depot, some 1,500 feet from the east entrance of the west yard, crossing the main line which is used by all passenger trains and all east-bound through freight trains. Upon reaching the freight depot a car was set out. The locomotive drawing the remaining cars then proceeded about 3,600 feet westerly from the freight depot to the entrance of a spur track and set out one of the cars. The movement was then easterly from the spur track to the west yard, recrossing the main line and stopping at the stockyards, where another designated car was set out. Thence the movement was eastward over the switching lead, connecting the east and west yards, to a junction of the lead track with the alley track. Then crossing the main-line passenger and the east-bound freight track, the movement was back down the alley track to a point where another car was set out, crossing several town streets. Further easterly movement was then had and a car was set out.

The defendant pleaded that all the movements between the two yards were governed by rules concerning yard movements, and that it was necessary to switch many of the cars from one to five or more times, and that unless great expedition was used injury to the shipping public would follow. Wenatchee is a town of approximately 6,300 people, lying almost entirely south of the railroad tracks, and the switching lead and main track cross but few streets in the town. By stipulation, the terms in the answer "switching crew," "switching yard," "switching cars," "switching engine," so far as applicable to the movements referred to in the case, are not to be regarded as facts admitted by the United States, but are as used descriptively of defendant's contention, and the nature of the movement made by the engine and the cars is to be determined by the facts pleaded, and not by the conclusion pleaded that they were switching movements.

An outstanding material fact is that, after the cars were assembled in the eastern yard, the engine and six cars were operated as a unit over lines used by all through freight trains, and the unit crossed over the main line used by all passenger trains and across several city streets. In its entirety the movements involved operations on tracks not set apart for switching operations, and we must conclude that they were train movements, rather than switching operations. In United States v. Erie Railroad, 237 U. S. 402, 35 Sup. Ct. 621, 59 L. Ed. 1019, though there were many more tracks, the situation was not unlike that at Wenatchee. Several yards were connected by double tracks extending from Jersey City and Weehawken to the east portal of a tunnel, and then, passing through the tunnel to Bergen, making a situation illustrated by treating the three yards as located at the outer points of the letter Y. The connecting tracks were not used by passenger trains, but were the main tracks over which freight was moved from and to points around New York Harbor. The yards at the several points were used for receiving, forwarding, distributing, and assembling cars preparatory to sending them to their ultimate destinations, though most of the regular west-bound freight trains were

made up and started in the Bergen yard, and most of the regular east-bound freight trains were stopped and broken up there. Transfer trains, which only ran between the yards, were operated over the double tracks; such transfer trains being drawn and operated by engines and crews especially engaged in that service, the trains running at low speed under orders of the yardmaster.

Upon each trip the trains passed over several switches leading to other tracks, and traversed part of the same line over which a number of regular through and local freight trains were moved each day, and crossing at grade tracks which were used by a number of passenger trains. On some of these transfer trains no attempt was made to connect any of the air brakes, and no cars were switched out of or into the transfer trains while they were on the way from one yard to the other. The Supreme Court dissented from the view that the three points were but a single extensive yard, and emphasized the fact that the yards were from 2 to 3½ miles apart, and were not so linked together as that cars could be moved from one to the other with the freedom which is usual and essential in intrayard movement. The court said that the air brake provision deals with running trains as a unit, and that the statute used "train" as an engine and cars which have been assembled or coupled together for a run or trip along the road. It was also said:

"But it is otherwise with the various movements in railroad yards, whereby cars are assembled and coupled into outgoing trains, and whereby any outgoing trains which have completed their runs are broken up. These are not train movements, but mere switching operations, and so are not within the air brake provision."

Distinguishing in this way, it was held that the transfer trains were "made up in yards like other trains, and then proceeded to their destinations over main-line tracks used by other freight trains, both through and local," and were not moving cars about in a yard or on tracks set apart for switching operations. This being found, such transfer trains were held exposed to hazards which made it essential that appliances be at hand for readily and quickly checking or controlling their movements, and the act was applicable. In United States v. C., B. & Q., 237 U. S. 410, 35 Sup. Ct. 634, 59 L. Ed. 1023, the court reiterated its position with respect to transfer trains. In that case at Kansas City there were two yards, about two miles apart, and both were used for receiving and breaking up incoming trains, assembling outgoing trains, and storing and distributing cars, and it was necessary for a large proportion of the cars to be moved from one yard to the other.

The connecting track was a main-line track. Transfer trains ran over the main-line track connecting the two yards, and were operated by yard or switching crews, were controlled by block signals, and each train was moved as a unit from one yard to the other. The court held that the movement of the transfer trains was not shifting cars about in a yard or on isolated tracks devoted to shipping operations, but was moving traffic over a considerable stretch of main-line track, and that unless the engineers were able readily and quickly to check

or control the movements they became a serious menace to other trains, which the statute was equally designed to protect. The court said it was not material that the men in charge of the movements of the trains were designated as yard or switching crews, "for the controlling test of the statute's application lies in the essential nature of the work done rather than in the names applied to those engaged in it."

Applied to the facts in the present case, the rule of the decisions cited leads us to hold that the railway company was not moving cars about in a yard or on tracks set apart for switching operations at Wenatchee, but moved the train between two yards over a considerable stretch of main line, and unless the engineers could readily and quickly check or control the movements of the trains they were exposed to hazards which the statute covered, and they also became a danger to the safety to other trains which the statute was equally designed to protect.

Inasmuch as we must follow the letter and spirit of the statute, we do not attach importance to the suggestions that the construction adoped means delays in coupling air brakes, testing power or air brakes, and in uncoupling air hose. To a somewhat similar argument in Louisville, etc., Bridge Co. v. United States, 249 U. S. 534, 39 Sup. Ct. 355, 63 L. Ed. 757, the Supreme Court replied that failure by the carrier to comply with the statute will not be excused by care to avoid the danger which the appliances prescribed were intended to guard against, nor by the adoption of what might be called equivalents of the requirements of the Act.

The judgment is affirmed.