## UNITED STATES v. GREAT NORTHERN RY. CO.*
### No. 7552. .

Circuit Court of Appeals, Ninth Circuit.
Nov. 13, 1934.

WILBUR, Circuit Judge, dissenting.

———◆———

See, also, 68 F.(2d) 610.

J. Charles Dennis, U. S. Atty., and John Ambler, Asst. U. S. Atty., both of Seattle, Wash., and M. C. List, Sp. Asst. to U. S.

*Rehearing denied Jan. 7, 1935.

Atty., of Washington, D. C., for the United States.

Thomas Balmer and Charles S. Albert, both of Seattle, Wash., for appellee.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

GARRECHT, Circuit Judge.

This case has been tried and appealed twice. Both trials resulted in verdicts for the defendant. The controversy concerns the movement of a certain switching engine and cars by servants of the appellee within the area known as and designated in the exhibits as "Seattle House Yard," an industrial district in the southern part of the city of Seattle. The evidence shows that at 8 a. m. on January 19, 1932, appellee's switch engine, operated by a switching crew, started from one of the tracks adjacent to the Great Northern freight house, located in the northerly portion of said house yard, and ran light, or without any cars, to Spokane street, which forms the southerly boundary of the yard where the tracks form a curve to what is called Fifth avenue switching track. This avenue, so called, is merely a railroad right of way situated where Fifth avenue would be if opened up. The engine proceeded on this track on the east side of the said right of way north to a point almost opposite to the freight house. Here the crew began a series of switching movements, picking up cars at different points until it had assembled nine cars on the east side of Fifth avenue. These cars were then pulled down and were left standing on the straight track about 100 feet north of Spokane street. The engine then ran north on the west side of said Fifth avenue right of way and collected three other cars, then moved back along the said west side to Spokane street. The distance of this movement of the engine and three cars without an intermediate switching is over a mile.

After this return movement, the three cars were connected with the other nine. The various activities engaged in up to this time had occupied the switching crew for more than two hours. Now, at 10:26 a. m., began the movement complained of, which ended at 10:39 a. m. The engine and twelve cars, having been connected, moved toward the freight house over the course traversed by the engine and crew in entering the yard in the morning. After running a distance of approximately 1½ miles, the movement stopped, and there the government inspectors ceased their observations.

However, after having come to the stop, the engine and one car were disconnected from the others and ran down on one of the tracks adjacent to the freight house where the car was switched out. Then the engine and the crew engaged in the further switching of cars, and, after a time, another car was brought and joined to the eleven which had been left standing in a body, and the twelve cars were then coupled up and the air brakes connected, and the transfer started for a point known as Interbay, approximately 6 miles distant, and where the Great Northern yard is located.

The government charges a violation of an order of the Interstate Commerce Commission, issued pursuant to the provisions of section 2 of the Act of March 2, 1903 (32 Stat. 943, 45 USCA § 9), commonly known as the Safety Appliance Act, which order reads as follows:

"It is ordered: That on and after September 1, 1910, on all railroads used in interstate commerce, whenever, as required by the Safety Appliance Act as amended March 2, 1903, any train is operated with power or train brakes, not less than 85 per cent. of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train, and all power-braked cars in every such train which are associated together with the 85 per cent. shall have their brakes so used and operated."

The government in making out its case excluded from its evidence, and disregarded all reference to the movement of the switch engine and crew prior to the assembly of the twelve cars on Fifth avenue right of way, which had occupied the efforts of the crew from 8 o'clock until 10:26 a. m., and also sought to exclude everything that occurred after the mile and one-half run, basing the claim of violation of the order upon the movement of the twelve cars and locomotive from the point where they had been assembled on the right of way near Spokane street, to the point where they first stopped and where the engine was again detached to be engaged in further switching movements.

The government takes the position that when the locomotive and twelve cars moved over lead tracks for a distance of a mile and a half, with no stops en route, to set out or pick up cars, that such movement was a train movement and not a switching operation. On the other hand, appellee insists that the 1½ mile movement singled out for attack by the government in this case was but part of the task of switching in a highly industrial-

ized district of the city of Seattle, and was part of the work of making up a train, and was not itself a train movement.

The evidence conclusively shows that here was a switching crew with a switch engine engaged in the house yard of the appellee in making up a train to transfer from this house yard to the Interbay yard. It must be admitted that before the twelve cars were assembled at Spokane street the movements were switching movements, also, that after the mile and one-half run to the point where the twelve cars were again stopped, other switching movements took place. May appellant be permitted to select this single movement of a mile and one-half and separate it from the other corelated movements and activities which differentiate and distinguish a switching movement from a train movement, and insist that the court shall exclude all other evidence?

■ Appellant complains because the court permitted expert railroad men to express opinions as to whether or not the transfer of the engine and cars charged to be a violation of the law was a switching movement. These opinions were given by witnesses for both sides without objection. At the conclusion of the trial, appellant requested that the court instruct the jury "to disregard the opinions of all witnesses as to whether or not the movement * * * was a train movement or a switching operation." The requested instruction was too broad, as any objectionable opinion testimony was so involved with other proper expert testimony from these railroad men that it would be difficult for an ordinary jury, without additional instructions, to determine the particular evidence that this instruction covered. At the time the opinion evidence was received, no objection was made to its admissibility. The proper time to have raised this question was when the evidence was being offered. We think that in the circumstances the court committed no error in refusing the instruction.

■ Appellant also requested the court to instruct the jury that in determining whether or not the movement complained of on the day in question was a train movement or a switching operation, the jury should consider only this particular movement, and should give no consideration to what was usually or customarily done on other days. Here again the evidence on this point was received without objection. Afterwards, counsel for the government asked that it be stricken. In denying the motion the court

said: "It went in without objection; you took the chance of having it favorably answered, and having taken that chance, you are estopped from making that motion; denied." This instruction, the refusal to give which is urged as error, was designed to accomplish the same purpose as the motion. As indicated elsewhere in this opinion, appellant sought to select and segregate this single movement and separate it from its connection with the other operations then being engaged in by the crew, and without regard to the customary work ordinarily and generally being done in the house yard, which would result in a distorted rather than a correct presentation of the nature of the work being done.

■■ Appellant further complains that the court also permitted testimony in relation to the work of switching done in the "house yard" as to the inconvenience that might result from coupling up the air one day and leaving it uncoupled the next day, where sometimes there was immediate work to do and sometimes there was not. At the time the objection was made, the court restricted the evidence and advised the jury:

"* * * Now, if this was a train movement or transfer movement, it does not make any difference how much inconvenience would result, but the inconvenience that probably would result may be taken into account by the jury as a circumstance bearing upon the question of whether this was a train movement or switching operation. * * *"

In connection with the giving of this evidence appellant further asserts that the court committed error in advising the jury:

"On a statute enacted by Congress, the words used ordinarily would have this common meaning, as people ordinarily understand them, but when a law like this is made for the control of those operating trains, it relates to a particular calling, a particular occupation, it was enacted to guide the men operating trains and direct them, what they should do in the operation of trains. Therefore, when a word is used, used as this word 'train' is used in this Statute. The court instructs you, as a matter of law, that it is used in the sense that railroad men could understand it, because it was made for their guidance and direction."

This was comment by the court bearing upon the nature of the evidence then being offered and the reason of its admission and applicability, and was not intended to and did not unduly hamper the jury in its find-

ing, particularly as the meaning of the words "train" and "switching" were thereafter correctly given in the court's general instructions.

As pointed out by the appellant, the test does not lie only in the distance of the movement, nor in the number of cars, nor the kind of track, nor even if the work was being done by switching engines or switching crews, but "the controlling test of the statute's application lies in the essential nature of the work done." Louisville & J. Bridge Co. v. U. S., 249 U. S. 534, 540, 39 S. Ct. 355, 357, 63 L. Ed. 757; U. S. v. Chicago, Burlington & Quincy R. R. Co., 237 U. S. 410, 413, 35 S. Ct. 634, 59 L. Ed. 1023.

In order for the jury in this case to determine what was "the essential nature of the work done," it was necessary for them to be informed what was customarily done in switching movements in and about this house yard.

The appellant assigns as error the refusal of the court to give certain other requested instructions. Many of these requests amount in effect to a direction to the jury to find for the appellant, the others, while containing correct propositions of law, are coupled with other argumentative matter, and these were properly refused.

In its general instruction the court defined "switching" as follows:

"The court instructs the jury that a switching operation is the assembling of cars into a unit to be later hauled as such unit from the point of assembly to some other point. It has been pointed out in this case that the breaking up of a train after it has been hauled to its destination is also a switching movement, but that isn't necessary to be considered in this case, for if this was a switching movement, it was because of the assembling of cars for a train movement."

The court's definition of a "train movement" as given in the general instruction was:

"The court instructs the jury that the movement of a train is the movement of a locomotive with one or more cars as a unit following the assembling of such unit.

"A moving locomotive and cars attached are without the provision of the Act, only when they are not a train as when the locomotive is engaged in switching, classifying and assembling cars in the yard to make up a train.

"If you should find that at the time and place where the offense referred to in the complaint is alleged to have occurred, the engine and cars were being used in a switching operation and were not then run as a train, your verdict should be for the defendant, but if you should find this movement of these twelve cars was not a switching movement—and it was a train movement, then your verdict should be for the plaintiff."

These instructions were as adequate as those proposed by appellant.

Appellant also predicates error upon the refusal of the court to direct a verdict in its favor, and insists that a question of law only was presented. In the case of Philadelphia & R. R. Co. v. Bartsch (C. C. A.) 9 F. (2d) 858, 860, where a similar question was involved as to whether the draft was a train, and accordingly whether the movement was a train movement or a switching movement, the court said:

"The evidence permitted conflicting inferences. There was enough evidence for the jury to determine as a fact either that the movement was of a train or of a draft for switching purposes."

Applying the criterion evolved from the decisions of the Supreme Court of the United States that "the controlling test of the statute's application lies in the essential nature of the work done," the facts warranted the finding that the crew at the time was engaged in the assembly of cars by means of a series of switching movements, and that at the time complained of the cars had not been assembled into a train to be transferred as such to any particular point. The government sought to establish a "train movement" by presenting only a part of the work being done by the engine and crew, and disassociating it from the surrounding circumstances. Either the inspectors for the government were endeavoring to make an isolated movement, usually connected with other movements, come within the definition of a train movement, or they erroneously assumed that these cars had actually been assembled into a train unit for transfer to Interbay yard, some 6 miles distant. They also seemed to have incorrectly assumed, or left it to be inferred, that there was no more switching to be done before the train was made up that day.

Had the government inspectors continued to observe the engine and crew in order to ascertain the "essential nature of the work being done," they would have learned, as the undisputed testimony shows, that after the engine had transported the cars to the point where the inspectors had discontinued their observations, the switching of

cars was resumed; one of the cars which had been assembled with the others was disconnected and delivered to another place, the engine and crew then went elsewhere and brought a car of merchandise, which was then placed with the other cars, and the train made up; the air brakes were then connected and the cars went into a train movement to the Great Northern yards, located at Interbay, 6 miles distant.

Operations such as the one complained of here have been carried on in the "house yard" for many years in the manner described without criticism and without complaint from the inspecting officers. No court has gone to the extent of sustaining the position taken by the government in this case.

There are important distinctions in this case from those relied upon by the appellant to support the contention that this isolated movement presented here was a train movement. In the case of U. S. v. Southern Pacific Co. (C. C. A.) 60 F.(2d) 864, 865, cited by appellant, this court extended liability to the limit, but in that case the inquiry was whether under the conditions described separate yard sections or units, which were a mile apart, connected by a track upon no point of which, between the two yard sections any separation of cars occurred, and where there was no purpose that any should occur, constituted a single terminal yard. The court held that "a distant set of switching facilities, whether reached over a main line track, or over a distant track limited in its use to transfer purposes, will be classed as a separate yard."

The case seems to have been decided upon the authority of Great Northern Ry. Co. v. U. S. (C. C. A.) 288 F. 190, 191, also cited by appellant. This case is readily distinguishable from the one at bar. There an engine and twenty-four cars were moved from the "P" yard a distance of 4,800 feet, to the "Hay" yard. The court there said:

"It was not a mere switching operation, but was a transfer movement of the 24 cars from one distinct entity, known as 'P' yard, to another entity, known as the 'Hay' yard."

Attention is also called to the case of U. S. v. Northern Pacific Ry. Co. (C. C. A.) 54 F.(2d) 573, 574. There the violations complained of were the moving of a string of cars left standing on the side track in the vicinity of the depot along the main line track for a distance of somewhat over one-half mile where the engine switched the cars. The engine then continued along the main track for a distance of slightly over a mile, and, after disposing of another car, took two loaded oil cars for a return trip. It returned to the depot yards along the main line track with the two loaded oil cars. It is easy to understand how particularly this last movement was correctly held to be a train movement. The court there said:

"We are of the opinion that the movements complained of were train movements and subject to the requirements of the Safety Appliance Act. They were in no sense switching movements within the railroad yards where trains were assembled or broken up."

The opinion then quotes language of Justice Brandeis in U. S. v. Northern Pacific Railway Co., 254 U. S. 251, 41 S. Ct. 101, 65 L. Ed. 249, as follows:

"A moving locomotive with cars attached is without the provision of the act only when it is not a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains."

The testimony in the case at bar tended to show that the engine and crew were engaged in switching, classifying, and assembling cars within the railroad yard, for the purpose of making up a train to be taken to Interbay.

The case of Great Northern R. R. v. United States, 297 F. 692, 694, decided by this court, involved the movement of two strings of cars from Appleyard, over a track used for moving westbound through freight trains, to another yard, a distance of 8,000 feet. The language of the opinion makes clear its distinction from this case:

"An outstanding material fact is that, after the cars were assembled in the eastern yard, the engine and six cars were operated as a unit over lines used by all through freight trains, and the unit crossed over the main line used by all passenger trains and across several city streets. In its entirety the movements involved operations on tracks not set apart for switching operations, and we must conclude that they were train movements, rather than switching operations."

After referring to other authorities the court continued:

"Applied to the facts in the present case, the rule of the decisions cited leads us to hold that the railway company was not moving cars about in a yard or on tracks set apart for switching operations at Wenatchee, but moved the train between two yards over a considerable stretch of main

line, and unless the engineers could readily and quickly check or control the movements of the trains they were exposed to hazards which the statute covered, and they also became a danger to the safety to other trains which the statute was equally designed to protect."

Further distinguishing that case from operations where cars are moved about in a yard, it points the distinction by applying language used in U. S. v. Erie R. R., 237 U. S. 402, 35 S. Ct. 621, 624, 59 L. Ed. 1019:

"But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains, and whereby incoming trains which have completed their run are broken up. These are not train movements, but mere switching operations, and so are not within the air-brake provision."

The judgment of the District Court must be affirmed.

WILBUR, Circuit Judge, dissenting.

For the reasons stated in my concurring opinion on the former appeal (68 F.(2d) 610) in this case, I think the jury should have been instructed by the court as to whether or not the movement in question was a train movement, in view of the fact that the testimony was undisputed. On the previous hearing I did not express an opinion as to whether or not the jury should have been instructed as a matter of law that the movement in question was a train movement. It appears upon the retrial that the engine and twelve cars were moved a distance of 1.45 miles without stopping and without attaching or detaching any cars, and that although there were five points in the first ¾ of a mile of that trip where on some occasions cars were picked up or detached, upon the particular trip involved in this action it was known at the time the train started to make the trip of 1.45 miles that there would be no intermediate switching on the day in question.

Under these circumstances I think that the jury should have been instructed that the movement in question was a train movement and that the verdict should have been in favor of the government.

If the majority opinion had determined that as a matter of law the movement in question was a switching movement, I would refrain from further comment, contenting myself with a statement of my different view as to the legal conclusion to be drawn from the facts. But as I understand the main opinion, it assumes that the question of whether or not the movement in question was a train movement or switching movement was one to be determined by the jury and that it was so determined under proper instructions. As I feel that the judgment should be reversed because of errors during the trial and conflicting instructions upon the law which left the jury without any guide in their deliberations, I will proceed to point out some of the objections I find in the record to the admissibility of opinion evidence and to the instructions given by the court.

The court instructed the jury as follows:

"The court instructs the jury that the movement of a train is the movement of a locomotive with one or more cars as a unit following the assembling of such unit."

As stated by the appellee, "the facts in the present case are not in dispute." The jury was instructed as follows:

"Mr. List: I further ask the court to instruct the jury that the only question in this case in issue is whether or not the movement of the twelve cars in question was or was not a train movement or a switching operation, all other factors being admitted—not contradicted.

"The Court: The jury are so instructed."

It is not disputed that the movement in question was a "movement" of a locomotive and one or more cars as a unit. The instruction does not inform the jury how far the locomotive must move the cars in order that the movement shall be a train movement. Within the meaning of the instruction, any movement, however slight, would be a movement of a train if it followed "the assembling of such unit." It is not disputed that this movement of 1.45 miles followed the "assembling of such unit." If it were a train movement within the definition given to the jury by the court, it was not a switching movement within the definition given by the court in the above-quoted instruction. The theory of the main opinion is that the jury was justified in concluding that the attaching and detaching of a car after the locomotive and twelve cars was moved 1.45 miles was a switching movement, and that the whole of the operation of the cars preceding the arrival at point A was for the purpose of assembling cars and was therefore a switching movement, but this is not the instruction given by the court. It is evident that the jury did not understand the instructions according to their fair import for in the teeth of the instruction they

found that the movement was not a train movement. The question arises why the jury rendered the verdict for the defendant, in view of this instruction. I think that the reason is not difficult to ascertain, and as it involves one of the assignments of error before us, we will first allude to the assignment of error which involves the question. The government asked the court to instruct the jury that:

"The jury is instructed to disregard the opinion of all witnesses as to whether or not the movement of the Great Northern locomotive No. 5, tender and twelve cars was a train movement or a switching operation.

"The Court: Denied.

"Mr. List: Exception."

If I am correct in the premise that the question of whether or not the movement was a train movement was one of law to be decided by the court, it is obvious that the jury should not have considered the opinion of the witnesses as to the law. If the question is one of fact to be decided by the jury, as the appellee contends, it is equally clear that the opinions of the witnesses as to whether or not the movement in question was a train movement should be disregarded. That was the ultimate fact, if it be an issue of fact instead of one at law, to be determined by the jury. I turn now to a discussion of the opinion evidence upon the subject with a view of determining whether or not the court should have given the requested instruction, for if opinion evidence had been offered by both sides without objection, it might well be argued that counsel, after having submitted such evidence, were not entitled to instructions requesting them to disregard such evidence.

The first witness called by the government was William E. Weeks, chief inspector of the bureau of safety of the Interstate Commerce Commission. On direct examination he testified to the movement of the cars on the day in question. He was not asked by the appellant whether or not in his opinion the movement of cars for approximately a mile and a half was a train movement. On cross-examination he stated:

"The movement I characterize as a train movement was the movement of an engine and 12 cars from a point in the vicinity of Spokane Avenue and what would be Fifth Avenue South, if opened up, around over Spokane Avenue and northward on what would be Second Avenue, if opened up, to a point in the vicinity marked 'A' on this map."

In addition to referring to the movement of the cars for the mile and a half, he testified to the assembling of cars along Fifth avenue and the operations of the switch engine and cars along Spokane avenue for about a mile. He was then asked this question on cross-examination: "Do you call that a train movement? A. Yes."

It will be observed that the question calling for the opinion of the witness was addressed to the witness by the appellee. There is some confusion in the record as to whether or not the question related to the movement before arriving at Spokane and Fifth avenues, or after that period. To clear up this confusion later, there was considerable examination of witnesses which for the moment we need not consider.

The next witness, George B. Winter, called by the government, testified to the operation of the cars on the day in question. On cross-examination the witness was asked:

"Q. That is all the work that was done by this switch engine on the morning in question before the 12 cars were coupled up, was industrial switching? A. They were doing industrial switching at that time, yes.

"Q. And the movement as I have just described it to you, along both the east side of Fifth and the west side of Fifth, up to the time the 12 cars were put together, you characterize as industrial switching? A. Yes. * * * *"

Later the witness testified on cross-examination:

"The number of cars would have nothing to do with my conclusion that this was a train movement. Had it been an engine and one car I would still describe this movement as a train movement, exactly as I described the engine and 12 cars; that isn't necessarily a distinguishing feature."

This statement is in narrative form and whether or not it was in response to a question calling for opinion evidence is not shown by the record. On redirect examination the witness testified as follows:

"As to this particular movement in question, the one over which the controversy here is being discussed, I would describe as a train movement. As to the other one, from somewhere near Atlantic Street down to Spokane Street, I described that as industrial switching territory movement.

"Q. Is that a railroad term? A. Providing you are switching cars where you are setting out one, picking up one, making short movements; if you are making long

movements from one portion of the yard to another, then it is a train movement."

It does not appear whether or not the government asked for an expression of this opinion. This witness was examined at great length on cross-examination and redirect examination as to whether he considered the movements on the day in question train movements or switching movements, and which part thereof he considered switching movements and which part train movements. The large part of this examination was directed to clearing up the testimony of the witness on former trial and harmonizing it with the testimony in this trial with relation to movements which occurred prior to the 1.45 mile movement in question. The witness testified during this examination that there was a distinction between a railroad man's definition of train movement and switching service and the lawyer's understanding of those terms, but he was not permitted to state the difference because of objection that the witness was not qualified to give a legal answer.

The appellee called George Hembrooke, its switching foreman in charge of the operation of the switch engine on the day in question. In the course of his direct examination, after testifying in detail as to the operations on the day in question, he testified, "As a railroad man of 30 years' experience I would say that the work we did up to the time that the air was coupled was switching." This would cover the movement of 1.45 miles involved in this controversy. It does not appear that this question was objected to. A motion was made to strike out this testimony on the ground that "such a question being one of law for the court or of fact for the jury to decide." This was denied by the court and an exception taken. This was the first time during the trial that the question of the admissibility of opinion evidence was raised. On cross-examination of this witness by the counsel for the government the following testimony was given:

"I did not do it [couple up air brakes] on this day because, in my opinion, that was what I term a switching operation. That is in contrast to what I would otherwise term a train movement.

"Q. What do you understand a train movement to be? A. Well, train or transfer movement would be between two given points; that is, you wouldn't have going out on a mainline, where you want to increase the speed, where you travelled 30 or 40 or 50 miles an hour, where the track would be so you could, why—

"Q. (Interrupting) That is one of the differences, what other difference is there, Mr. Hembrooke, if you have any in mind? A. Between a train and a switch movement, you mean?

"Q. Yes, switch movement, you have described as a switch movement? A. And a train?

"Q. Yes, what are the chief differences? A. Well, speed would be one and distance you would have to travel.

"Q. And also the mainline which you referred to while ago? A. Yes, fast track or slow track.

"Q. If it is on the mainline, it wouldn't make any difference whether it was a fast or slow track? A. That is it."

On recross-examination the witness testified on that subject, as follows:

"The operation of drags of this kind, 12 or more cars similar to these, are made in what I term yard limits and are under control of the yard master. After they get out of the yard limits, and are termed a train, the yard master loses control of them and their control is handled by the train dispatcher. That is a distinction I draw between a train and switching; as soon as they leave the yard the yard master has no authority. * * *

"Q. It would be a switching operation all the way? A. Yes."

L. E. Barnes, general yardmaster for the appellee, having twenty years' railroad experience as yardmaster at Seattle, testified:

"I have heard the description of this work as it was usually done up to the time the air brakes were coupled at the point 'A'; in my judgment and experience as a railroad man, that was a switching movement and so understood among railroad men.

"Mr. Balmer: That is all."

During the redirect examination of this witness his attention was directed to the fact that there were five or six places in the first half mile of the mile and a half run from Spokane avenue to Fifth avenue, point "A," where on some occasions cars would be picked up or detached, although on the occasion in question the train crew knew there would be no such operations on the day in question. The witness was asked a question which is germane principally because of the instruction of the court to the jury in connection with the question. I will therefore quote the record in that regard as follows:

"Q. Will you please answer, then, what inconveniences might or would result on a track where sometimes there was intermediate work to do and sometimes there wasn't?

"Mr. List: I object, if the Court please. The question of inconvenience has been passed upon by the Circuit Court of Appeals.

"The Court: Objection overruled. The jury are instructed, if this was a train movement, and that includes what has been generally described as a transfer movement, although the courts have decided a number of times that the word 'transfer' is one of the words in our language that has the very broadest meaning, but, here, it seems to be used in a technical sense. Now, if this was a train movement or transfer movement, it does not make any difference how much inconvenience would result, but the inconvenience that probably would result may be taken into account by the jury as a circumstance bearing upon the question of whether this was a train movement or switching movement. If it was merely switching, there is no penalty, no wrong has been done by the defendant and there is no penalty to be imposed. In a statute enacted by Congress, the words used ordinarily would have this common meaning, as people ordinarily understand them but when a law like this is made for the control of those operating trains, it relates to a particular calling, a particular occupation, it was enacted to guide the men operating trains and direct them, what they should do in the operation of trains. Therefore, when a word is used, used as, this word 'train' is used in this statute. The court instructs you, as a matter of law, that it is used in the sense that railroad men would understand it, because it was made for their guidance and direction. Objection overruled.

"Mr. List: May I have an exception?

"The Court: Exception allowed.

"Mr. List: We, also, ask an exception to the statement of the court to the jury that the jury may consider the inconvenience in deciding whether or not this was a train or a switching operation.

"The Court: My instruction was they could consider that as a circumstance along with the other circumstances in the case, in deciding whether it was a train, transfer or switching movement.

"Mr. List: May I have an exception?

"The Court: Allowed.

"Mr. List: Also, Congress enacted the law and used the term 'train' to be consider-ed by the railroads in its ordinary acceptation or understanding by the railroads for their guidance.

"The Court: That wasn't the instruction. I said in an Act of Congress, the words used in it would, ordinarily, be understood as ordinary men understood them, but this statute was made for the direction and control and guidance of railroad men and, therefore, the word 'train' would be understood as railroad men usually and customarily understand it.

"Mr. List: The last part is what I have excepted to.

"The Court: Allowed."

Counsel object to this informal instruction of the court made during the progress of the trial on the ground that it is virtually an instruction in favor of the defendant because of the fact that several railroad men testifying for the defendant had stated that in their opinion the movement in question was a switching movement and not a train movement. This objection is well taken.

It is also objected that the court improperly instructed the jury that the inconvenience which would probably result (from coupling and uncoupling the air brakes, as we understand it, or from changing the method of operation over the mile and a half of track in case there were no cars to be picked up or detached during the run) may be taken into account by the jury as a circumstance bearing upon the question whether this was a train movement or a switching movement. On the conclusion of the defendant's testimony, George B. Winter, one of plaintiff's witnesses, was recalled. He produced a book of rules entitled "Great Northern Railway Company Transportation Rules," which he testified had been in effect for some time. Thereupon the witness was questioned as follows:

"Q. Do they set forth a definition of a train? A. Yes.

"Q. Will you kindly read that? I have promised to return this book, so I don't want to put it in the record. * * * You just read that one definition, Mr. Winter? A. Entitled, 'Train: An engine or more than one engine coupled with or without cars displaying markers.' * * *

"Q. Now, to clear up what was confusion to me and, perhaps to some others, yesterday, you testified that certain movements, as asked by Mr. Balmer, were, in your opinion, train movements? A. Yes.

"Q. Were you answering that, having in mind the railroad definition of a train or

definition of a train as passed upon by the Supreme Court of the United States?"

This question was objected to and the objection sustained. On cross-examination the witness was asked the following:

"Q. Now, you read the definition of a train in the Rule Book? A. Yes.

"Q. As an engine and cars displaying markers? A. Yes.

"Q. This engine and cars displayed no markers? A. It did not.

"Q. And it was not within the railroad definition of a train in the book which you read from? A. It was not."

In view of the instruction theretofore given by the court that the word "train" used in the statute should be construed "in the sense that railroad men would understand it because it was made for their guidance and direction," the appellant contends that the instruction of the court, together with this and the other evidence given by railroad men, was in effect an instruction to find for the defendant. The company rules were introduced by the appellant who cannot complain of the fact that such rule was in evidence. The rule was offered, however, for the purpose of enabling Winter to explain his testimony which otherwise was inconsistent. The opinion of the witness as to whether or not the movement in question was a train movement was not competent testimony. The government objected to such evidence upon that ground. The ruling of the court being adverse, they were entitled therefore to adduce evidence of that character without waiving their objection and exception to the evidence offered. I think that the appellant was in a position to ask for the instruction excluding this opinion evidence, although as pointed out, some of the appellant's witnesses had testified on that subject prior to the objection, but apparently in response to questions which did not directly call for opinion evidence. As the case was finally submitted to the jury, we have in the record opinions expressed by the appellant's witnesses that the movement in question was a train movement. We have the testimony of the witnesses who were railroad men that in their opinion the movement in question was not a train movement but was a switching movement. We have a rule of the company introduced in evidence defining the train movement in such fashion that it is clear the movement in question is not a train movement under the rule of the railroad company. We have a direction by the court to the jury that the words "train

movement" should be construed in accordance with the understanding of railroad men, which if applied to the testimony of the railroad men in the case and the rules of the company, would show that the movement was not a train movement. There is also an instruction by the court to the jury in his final charge which, as I have pointed out, required them to find that the movement was a train movement.

I conclude that the judgment should be reversed, first, for the refusal to grant appellant's motion for a directed verdict; second, for the refusal of the court to instruct the jury to disregard the opinions of the witnesses upon the ultimate question as to whether or not the movement was a train movement or a switching movement, as requested by the appellant; third, because it was error to overrule the appellant's objection to the testimony offered by the defendant to the effect that the movement in question was a switching movement; this error, however, is not assigned as error and is, therefore, only germane upon the question last considered.