**UNITED STATES v. SOUTHERN PAC. CO.**
No. 8868.

Circuit Court of Appeals, Ninth Circuit.
Jan. 14, 1939.

As Modified on Denial of Rehearing
Feb. 14, 1939.

---

Ben Harrison, U. S. Atty., and Francis C. Whelan, Ralph E. Lazarus, Asst. U. S. Attys., all of Los Angeles, Cal., and J. S. Hawley, Sp. Asst. to U. S. Atty., Interstate Commerce Commission, of Washington, D. C., for appellant.

W. I. Gilbert, of Los Angeles, Cal., A. G. Goodrich, of San Francisco, Cal., and W. I. Gilbert, Jr., of Los Angeles, Cal., for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

The United States instituted action against the Southern Pacific Company, a common carrier engaged in interstate commerce by railroad, to collect a penalty under the act of Congress known as the Safety Appliance Act, approved March 2, 1893 (27 Stat. 531), as amended by an act approved April 1, 1896 (29 Stat. 85), and as amended by an act approved March 2, 1903 (32 Stat. 943), 45 U.S.C.A. §§ 1 to 10, inclusive, and an order of the Interstate Commerce Commission issued pursuant thereto, dated June 6, 1910, fixing the minimum percentage of operative power brakes required in a train.[1]

The complaint sets out ten alleged causes of action, all but one of which (the sixth) were disposed of by confession of judgment. This cause was tried to the District Court, without a jury, and resulted in judgment for the defendant, the court holding that the movement complained of was a switching movement and not a train movement, and hence not violative of any provision of the Act. This is an appeal by the United States from such judgment.

On the morning of May 13, 1937, at about 9:14 a. m. one of defendant's switching engines, in charge of a switching crew, assembled nine cars from three different tracks in defendant's Old River Station Yard at Los Angeles, Calif. After such assembling the engine and nine cars proceeded as a unit over a yard running track about 1000 feet. At that point they en-

---

[1] The original Safety Appliance Act, so far as applicable here, is as follows:

"From and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any common carrier engaged in interstate commerce by railroad * * * to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose."

The amendment approved April 1, 1896, 45 US.C.A. § 6, fixes the penalty of $100 for each and every violation of said act. The amendment approved March 2, 1903, fixes the minimum number of cars to be operated by train brakes and is as follows:

"Whenever, as provided in said act [chapter], any train is operated with power or train brakes not less than 50 per centum of the cars in such train shall have their brakes used and operated by the engineer of the locomotive drawing such train; and all power-braked cars in such train which are associated together with said 50 per centum shall have their brakes so used and operated; and, to more fully carry into effect the object of said Act [chapter], the Interstate Commerce Commission may, from time to time, after full hearing, increase the minimum percentage of cars in any train required to be operated with power or train brakes which must have their brakes used and operated as aforesaid; and failure to comply with any such requirement of the said Interstate Commerce Commission shall be subject to the like penalty as failure to comply with any requirement of this section." 45 U.S.C.A. § 9.

The order of the Interstate Commerce Commission, dated June 6, 1910, reads:

"It is ordered: That on and after September 1, 1910, on all railroads used in interstate commerce, whenever as required by the Safety Appliance Act as amended March 2, 1903, any train is operated with power or train brakes, not less than 85 percent of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train, and all power-braked cars in every such train which are associated together with the 85 per cent shall have their brakes so used and operated."

tered defendant's westbound main passenger track, proceeding thereon some 2600 feet to Dayton Avenue tower. There they entered on a freight yard running track and proceeded thereon some 6000 feet to the entrance of defendant's "A" Yard. They entered the "A" Yard at this point and proceeded along the yard lead some 1200 feet to the yardmaster's office. The foreman in charge of the movement then entered the yardmaster's office to get instructions from the yardmaster as to what disposition to make of the nine cars. Upon receiving instructions from the yardmaster, the foreman proceeded to switch the nine cars to various tracks.

During the entire movement the air-brake hose between the engine and first car was not coupled, which precluded the operation of the air brake on any of the cars.

During the trip from Old River Station Yard to "A" Yard, a distance of slightly over two miles, no stops were made for the purpose of setting out, picking up or switching any of the cars. The yard foreman knew, before he left Old River Station Yard, that no switching would be necessary.

The engine and cars during the movement in question crossed one private highway crossing, which is protected by a wig-wag on each side. There are several block signals located on the tracks over which the engine and cars moved, governing movements thereover. The speed of the engine and cars in making the trip did not average in excess of ten miles per hour.

It is the contention of defendant appellee, and the District Court so found, that the movement complained of was not a train movement, but was a switching movement, and as such was not subject to the air-brake provisions of the law.

The appellant asserts that the movement was a train movement, and contends, since it is uncontroverted that the air-brake hose between the engine and the first car was not coupled, that the court should have granted the Government's motion for judgment in its favor as a matter of law.

Appellant also assigns as error the admission of certain testimony on behalf of the defendant, relating to switching cars together in train form immediately before the alleged train movement and relating to the breaking up of the train immediately after such alleged movement. Such questioned testimony also relates to the question of whether the engine used was a switching engine, whether the crews used were switching crews, whether the two yards were considered by the defendant as one unit, and as to safety devices along the movement route. In the view that we take of this case such assignments of error lose most of their importance. However, we are constrained to say that no hard and fast rule upon this point can be fashioned. But in a case where the train movement is as clear as it is in this case we cannot see that such evidence adds anything toward clarifying the issue.

One of the first cases arising under the air-brake provisions of the Safety Appliance Act to reach the United States Supreme Court was United States v. Erie Railroad Co., 237 U.S. 402, 35 S.Ct. 621, 59 L.Ed. 1019. In that case, as in the case at bar, the defendant railroad company maintained yards approximately two miles apart. The movement complained of in the cited case was between the yards. No cars were switched out of or into the train while on the way from one yard to another. The Circuit Court had held that the yards were not separate and distinct, but constituted in fact a single yard, and that the movements were switching operations. The Supreme Court reversed the Circuit Court, holding that the yards did not constitute one yard, and that the movements were train operations. In holding that the yards were separate and distinct, the court said (page 406, 35 S.Ct. page 623):

"We cannot assent to the view that the yards at Jersey City, Weehawken, and Bergen are but a single yard. They doubtless are important accessories to the defendant's eastern terminal, but that does not make them one yard. They lie from 2 to 3½ miles apart, are not so linked together that cars may be moved from one to another with the freedom which is usual and essential in interyard movements, and are in actual practice treated as separate yards."

The Court then gave the following test of what constitutes a train within the meaning of the statute (page 407, 35 S.Ct. page 624):

"It will be perceived that the air-brake provision deals with running a train. * * * As the context shows, a train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along

the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air-brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains, and whereby incoming trains which have completed their run are broken up. These are not train movements but mere switching operations, and so are not within the air-brake provision. * * *

"We are persuaded that the transfer trains moving from Jersey City and Weehawken to Bergen and vice versa came within the purview of the air-brake provision. They were made up in yards like other trains, and then proceeded to their destinations over main-line tracks used by other freight trains, both through and local. They were not moving cars about in a yard or on tracks set apart for switching operations, but were engaged in main-line transportation, and this in circumstances where they had to pass through a dark tunnel, over switches leading to other tracks, and across passenger tracks whereon trains were frequently moving. Thus it is plain that in common with other trains using the same main-line tracks, they were exposed to hazards which made it essential that appliances be at hand for readily and quickly checking or controlling their movements."

Another early case decided by the Supreme Court was United States v. Chicago, Burlington & Quincy R. Co., 237 U.S. 410, 35 S.Ct. 634, 59 L.Ed. 1023. There also the defendant maintained two freight yards, about two miles apart. The track connecting them was one by which passenger and freight trains entered and left the city, that is, a main-line track. The movement complained of was a transfer operation from one yard to the other, over the main-line track connecting the yards. The Supreme Court, citing the Erie Railroad Co. Case, supra, held the movement constituted a train movement, and not a switching operation, saying (page 412, 35 S.Ct. page 635):

"The work in which they were engaged was not shifting cars about in a yard or on isolated tracks devoted to switching operations, but moving traffic over a considerable stretch of main-line track,—one that was a busy thoroughfare for interstate passenger and freight traffic. Every condition suggested by the letter and spirit of the air-brake provision was present.

* * * Neither is it material that the men in charge were designated as yard or switching crews, for the controlling test of the statute's application lies in the essential nature of the work done rather than in the names applied to those engaged in it."

In the case of Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757, part of the movement complained of was over a main line track within the defendant's terminal yard. The court again held that the movement was a train movement, and not a mere switching operation. We quote from the decision of the court (page 538, 39 S. Ct. page 356):

"The work done with the cars, as described, was not a sorting, or selecting, or classifying of them, involving coupling and uncoupling and the movement of one or a few at a time for short distances, but was a transfer of the 26 cars as a unit from one terminal into that of another company for delivery, without uncoupling or switching out a single car, and it cannot therefore with propriety be called a switching movement."

The Court cites the Erie Railroad Co. Case, supra, and the Chicago, Burlington & Quincy R. Co. Case, supra, stating again, "The controlling test of the statute's application lies in the essential nature of the work done."

The Court also held that the fact that the street crossings were protected by gates is immaterial.

In United States v. Northern Pacific R. Co., 254 U.S. 251, 41 S.Ct. 101, 65 L.Ed. 249, no part of the movement was accomplished on the main line track, but the Supreme Court nevertheless held the act applicable. The court called attention to the fact that there is nothing in the act which limits the application of the provision in question to operations on main line tracks. In that case the court said (page 254, 41 S.Ct. page 102):

"A moving locomotive with cars attached is without the provision of the act only when it is not a train; as where the operation is that of switching, classifying and assembling cars within railroad yards for the purpose of making up trains."

Turning now to cases decided by this court, the case of U. S. v. Northern Pacific R. Co., 9 Cir., 54 F.2d 573 is in point. There the transfer train complained of

traveled over approximately one and one-half miles of main line track. This court held the movement to constitute a train movement, quoting from the Supreme Court case of U. S. v. Northern Pacific R. Co., supra, to the effect that a moving locomotive with cars attached is without the provision of the act only when it is not a train, and stating (page 574):

"In the transfer of cars from railroad yards to nearby points, or to other yards of a railroad company, where the main line is traversed for substantial distances, the railroad company is not authorized to claim that the movement is merely one of switching which will fall without the provisions of the act."

Another case in point, decided by this court, is U. S. v. Southern Pacific Co., 9 Cir., 60 F.2d 864. In that case the action was based on a transfer movement of cars made between two units of defendant's yard in San Francisco, Calif. No cars were picked up or set out en route, the assemblage of cars being moved as a unit. The switching necessary to make up and break up the transfer movement was done before the transfer started on its journey and after arrival at its destination. This court held the movement to constitute a train movement, holding that a transfer of a number of cars from one terminal to another for delivery, without uncoupling, comes within the statute.

Appellee relies greatly on the case of U. S. v. Great Northern R. Co., 9 Cir., 73 F.2d 736, decided by this court in 1934, wherein it was held that the movements complained of constituted switching operations rather than train movements. This court in determining whether or not the movements constituted switching or train movements considered the fact that switching operations occurred immediately prior to and following the movement complained of, stating (page 738):

" * * * appellant sought to select and segregate this single movement and separate it from its connection with the other operations then being engaged in by the crew * * * which would result in a distorted rather than a correct presentation of the nature of the work being done."

This court then held that the facts warranted the finding that the crew at the time was engaged in the assembly of cars within the railroad yard by means of a series of switching movements, and that at the time complained of the cars had not been assembled into a train to be transferred as such to any particular point.

It is not necessary for us to here point out the distinguishing features between the cases cited, because the distinctions are very effectively pointed out in U. S. v. Great Northern R. Co., supra. In the latter case the movement complained of took place entirely within the railroad yard, where no problem of avoiding interference in the use of tracks by speedy main line train movements could be encountered.

In the case at bar, the movement complained of was outside of any definite switching yard and constituted a definite movement of a train of cars from one point upon a main line track to another point about half a mile further along such main line track. The full extent of the movement after assembly of the cars in train form was slightly over two miles.

It is our opinion that, as a matter of law the case falls within the authority of the cited cases, and we therefore hold that the movement complained of constituted a train movement within the purview of the Act under which the action was brought. The District Court should have awarded judgment for the Government.

Reversed.