UNITED STATES v. NORTHERN PAC. RY. CO.

(Circuit Court of Appeals, Eighth Circuit.   January 15, 1919.)

No. 5115.

COMMERCE ⬅27(7)—SAFETY APPLIANCE ACT—TRAINS SUBJECT TO AIR BRAKE PROVISIONS—"SWITCHING OPERATION."

The movement by a switch engine of 40 or more cars coupled together over a Duluth terminal track, used only to connect different terminal yards, over which no through or local trains pass, and on which trains are moved slowly, without orders, time cards, or block signals, *held* a "switching operation," not within the air brake provision of Safety Appliance Act 1893, § 1 (Comp. St. § 8605).

In Error to the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Action by the United States against the Northern Pacific Railway Company.   Judgment for defendant, and plaintiff brings error.   Affirmed.

Roscoe F. Walter, Sp. Asst. U. S. Atty., of Washington, D. C. (Alfred Jaques, U. S. Atty., of Duluth, Minn., on the brief), for the United States.

D. F. Lyons, of St. Paul, Minn. (C. W. Bunn, of St. Paul, Minn., on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and TRIEBER, District Judge.

TRIEBER, District Judge.   The plaintiff in error, plaintiff in the court below, seeks a reversal of a judgment in favor of the defendant railway company, entered on a directed verdict of a jury.

There are two counts involved, each of them complaining of a violation of Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531, as amended and supplemented by Act April 1, 1896, c. 87, 29 Stat. 85 (Comp. St. §§ 8605–8612), Act March 2, 1903, c. 976, 32 Stat. 943 (Comp. St. §§ 8613–8615), and Act April 14, 1910, c. 160, 36 Stat. 298 (Comp. St. §§ 8617–8619, 8621–8623).   The first count charges that the defendant on September 21, 1916, operated a transfer train of 48 cars over its interstate line of railroad in and about Duluth, Minn., when less than 85 per cent. of the cars in said train had their air brakes used and operated, or so assembled and connected that they could be used and operated by the engineer of the locomotive drawing the train.   The second count charged a similar violation in the operation of a transfer train of 40 cars on September 22, 1916.

The only issue involved is whether the tracks over which these trains were operated were a part of defendant's interstate line of railroad

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

or merely side tracks used for switching purposes only. In United States v. Erie Ry. Co., 237 U. S. 402, 35 Sup. Ct. 621, 59 L. Ed. 1019, it was held:

"A train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains and whereby incoming trains which have completed their run are broken up. These are not train movements, but mere switching operations, and so are not within the air brake provision."

The court, in that case, found the facts to be that the trains complained of were made up in yards like other trains and then proceeded to their destinations over main line tracks used by other freight trains, both through and local. The court in its opinion said:

"They were not moving cars about in a yard or on tracks set apart for switching operations, but were engaged in main line transportation, and this in circumstances where they had to pass through a dark tunnel, over switches leading to other tracks and across passenger tracks whereon trains were frequently moving. Thus it is plain that, in common with other trains using the same main line tracks, they were exposed to hazards which made it essential that appliances be at hand for readily and quickly checking or controlling their movements."

And it was held that they were subject to the provisions of the act.

In United States v. Chicago, Burlington & Quincy R. R., 237 U. S. 410, 35 Sup. Ct. 634, 59 L. Ed. 1023, the facts found were:

"The defendant operates a railroad which passes through Kansas City, Mo., and is used largely in interstate commerce. Among its terminal facilities at that point are two freight yards known as the Twelfth Street yard and the Murray yard. These yards are on opposite sides of the Missouri river, the distance between their nearest points being about two miles. The track connecting them is one by which passenger and freight trains enter and leave the city; in other words, a main line track. For a distance of 3,000 feet it is upon a single track bridge spanning the river, and off the bridge it intersects at grade 12 or 15 tracks of other companies and passes through the Union Depot tracks. Besides its use by the defendant's trains, a considerable portion of it is also the line by which the passenger trains and some of the freight trains of the Rock Island and Wabash Railroads enter and leave the city.

"Both yards are used for receiving and breaking up incoming trains, assembling and starting outgoing trains, and assorting, storing and distributing cars. To reach their ultimate destinations, whether on the defendant's road or on those of other carriers, a large proportion of the cars have to be moved from one yard to the other, and this is accomplished by transfer trains which are run over the main line track connecting the yards. These trains usually consist of an engine and about 35 cars, are operated by what are termed yard or switching crews, and carry no caboose or markers. They have no fixed schedules and are not controlled by a train dispatcher, but by block signals, as are all other trains moving over the same track. Each train is moved as a unit from one yard to the other, and not infrequently is both preceded and followed by other trains, passenger and freight.

"The three trains, the running of which is charged to have been violative of the statute, were transfer trains of the class just described. They were run from one yard to the other on August 9, 1910, and were composed, respectively, of 42, 36, and 39 cars, of which only 9 in one train and 10 in each of the others had their air brakes connected for use by the engineer. At that time air brakes were required to be used on 75 per cent. of the cars in a train. [In re Power or Train Brakes] 11 I. C. C. 429, 437."

And the court held that as the trains were engaged—

"not shifting cars about in a yard or on isolated tracks devoted to switching operations, but moving traffic over a considerable stretch of main line track—one that was a busy thoroughfare for interstate passengers and freight traffic. Every condition suggested by the letter and spirit of the air brake provision was present. And not only were these trains exposed to the hazards which that provision was intended to avoid or minimize, but unless their engineers were able readily and quickly to check or control their movements they were a serious menace to the safety of other trains which the statute was equally designed to protect."

And it was held that upon these facts they were trains in the sense of the statute.

The undisputed evidence in this case establishes the fact that neither of the trains was operated on the dates alleged with 85 per cent. of air brakes, and that the tracks over which they were operated were not main tracks, but tracks used for switching purposes only.

Owing to the topographical conditions at Duluth, it is necessary that the yard and industrial tracks be confined to a narrow space, and the terminals at Duluth are, owing to the many industries and the large shipping there, necessarily very extensive in length. Duluth is the largest terminal on that railway. At Rice's Point there are 55 tracks, each 4,000 feet long. The main tracks, over which all trains, not used for switching purposes exclusively, are operated, are north of the tracks over which the trains in controversy were operated. Along these switch tracks there are a number of yards, among them Rice's Point yard and Furnace yard, all termed "Duluth Terminals," and commonly referred to as "D. T. Tracks." It was between these two yards the trains mentioned in these two counts were operated without having 85 per cent. of the cars equipped with air brakes.

At one of the points this track crossed the tracks of the Duluth, Winnipeg & Pacific Railroad, which is used by that road for freight trains moving through West Duluth to Superior, Wis. Further east this track crosses the tracks of another line, which are used for general traffic. It also crosses a track of the Duluth, Missabe & Northern Railroad. The yards along this "D. T." track are all operated as one yard. There are no train orders, time cards or block signals giving the movement of cars along this track, and no train has the right of way over any other train; they are all operated at a slow speed, so that they may be stopped within vision. No freight or passenger trains, either local or through, ever use any part of these "D. T." tracks. The book of rules of the defendant railway company, which governs the operation of the railway, defines the meaning of a main line or main track:

"A track extending through yards and between stations, upon which trains are operated by time-table or train order, on the use of which is controlled by block signals."

The undisputed testimony also establishes the fact that no part of any of these tracks is ever used by any of the trains running between stations, freight or passenger, but that they are used exclusively for switching purposes to supply the industries along these tracks with

loaded cars or empties to be loaded for outgoing freight, for delivery to the main line.

From these facts no other conclusion can be reached than that of the learned trial judge, that these train movements were mere switching operations, and therefore not within the air brake provision of the act of Congress, as determined in the Erie and Chicago, Burlington & Quincy Railroad Cases, supra.

The District Court committed no error in directing a verdict on these counts for the defendant, and its judgment is affirmed.