## UNITED STATES v. GREAT NORTHERN RY. CO.

Civ. No. 2016.

United States District Court
W. D. Wisconsin.

March 5, 1952.

Thomas E. Fairchild, U. S. Atty., Madison, Wis., James O. Tolbert, Washington, D. C., Attorney for Interstate Commerce Commission, for plaintiff.

C. J. Hughes, Superior, Wis., W. P. Westphal, St. Paul, Minn., for defendant.

STONE, District Judge.

### Findings of Fact

I.

The defendant, Great Northern Railway Company, a Minnesota corporation, owns and operates a system of railway as a common carrier in interstate and intrastate commerce in the states of Wisconsin, Minnesota, Iowa, South Dakota, North Dakota, Montana, Idaho, Washington, Oregon, California and the province of British Columbia. At Superior, Wisconsin, it maintains and operates one if its important terminals. Its facilities at this terminal consist of yards, shops, roundhouses, grain elevators, ore docks, a warehouse and an office building for the Mesabi Division. One of its yards in the City of Superior is called by it the "Superior Yard". It has another yard in the City of Superior called the "Allouez Yard" and a yard just beyond the city limits of Superior called the "Saunders Yard", which are respectively 9 and 4 miles from the Superior Yard.

II.

Exhibit 1 is a map drawn to the scale of 1"=100' showing the Superior Yard and the shop and roundhouse area of the Great Northern Railway Company in the City of Superior. The various yards described in Paragraph III hereof are shown as marked on Exhibit 1. The track switches along the route of the movement in question are shown circled in green and num-

bered 1 through 16 consecutively from track No. 15 in the Elevator Yard to track No. 8 in the Outbound Yard. The movement of the cars, which is the subject of this action and which is described in Paragraph XVI hereof, is shown in the solid red line running along the tracks used. The movements of the crew in assembling the 12 cars in the Elevator Yard and in classifying the 12 cars in the Outbound Yard are indicated by the dashed red line.

Exhibit 2 is a map, identified on its face as "Map of the City of Superior, Douglas County, Wis., 1929, E. B. Banks—City Engineer, Raymond Mapp—Delineator" and is a substantially correct representation of the relationship of the area involved in this action to the remainder of the City of Superior.

Exhibit 3 is a photograph taken at a point 250 feet north of the L. S. T. & T. railroad crossing looking southwesterly and southeasterly showing the view available on the approach to the railroad crossing from the north. To the left of the crossing is shown the shelter house for the flagman on duty at the crossing.

Exhibit 4 is a photograph taken from the cab window of Engine No. 1173 on the engineer's or right hand side at a point 220 feet north of the Winter Street grade crossing showing the view of Winter Street available in a westerly direction.

Exhibit 5 is a photograph taken from the cab window of Engine No. 1173 on the fireman's or left hand side at a point 220 feet north of the Winter Street grade crossing showing the view of Winter Street to the east.

### III.

The Superior Yard, as shown on Exhibit 1, consists of several component and contiguous parts, designated for operating convenience by names such as the Twenty Yard, Forty Yard, Sixty Yard, Outbound Yard, Flour Yard and the Elevator Yard. The Twenty Yard is located in the southerly portion of the Superior Yard and is used for breaking up incoming trains and classifying incoming freight cars. The Outbound Yard, which consists of 17 tracks, is adjacent to the Twenty Yard and is used for classifying and assembling outgoing cars and in making up outgoing trains. The Forty Yard is used for the classification of "high class" empty freight cars such as refrigerator cars and box cars used in shipping flour, paper, etc. The Sixty Yard is used for the classification of "rough" empty freight cars such as gondolas, hopper cars and flat cars. The Flour Yard and the Elevator Yard are located at the northerly end of the Superior Yard and are used principally for the temporary storage of both loaded and empty box cars which are to be loaded or unloaded at Elevators "X" and "S". These elevators are owned and maintained by the Great Northern Railway Company as a part of its railroad system.

The Outbound Yard is located between the Flour and Elevator Yards on the north and the Twenty Yard on the south. The Outbound Yard is connected to the Flour and Elevator Yards by two lead tracks, designated as the Flour Yard Lead and the Northwest Lead. These lead tracks north of Winter Street are constructed on a grade ascending from the north to the south of .7%. Across and south of Winter Street the grade is .4%.

### IV.

A single track of the Lake Superior Terminal and Transfer Railway Company crosses the Flour Yard Lead and the Northwest Lead at right angles at a point 250 feet north of the Winter Street grade crossing. This railroad crossing is protected by a flagman and a manually operated semaphore. In addition, signs bearing the words "Stop R.R.X." are located approximately 260 feet from said railroad crossing on the four approaches to the crossing. All movements on the L.S.T. & T. tracks come to a stop before proceeding over this crossing, whereas movements on the Great Northern tracks do not have to stop unless the semaphore signal indicates stop. All movements proceed over said crossing as directed by and in compliance with signals given by the previously mentioned flagman and semaphore. The records of the defendant railway company show that this crossing has been free of all accidents since the crossing was established more than 60 years ago.

## V.

The track of the Lake Superior Terminal and Transfer Railway, as it runs west of the defendant's two leads crosses a railroad bridge leading to Duluth as shown on Exhibit 2. The following is the approximate number of trains using the Lake Superior Terminal and Transfer Railway track and crossing the defendant's two lead tracks during each 24 hour period:

Soo Line—3 passenger trains each way.

Duluth, South Shore & Atlantic Railway—1 passenger train each way.

Duluth, Winnipeg and Pacific—average 2 freight trains per day each way.

Northern Pacific Railway—1 passenger train and 2 freight trains each way.

Lake Superior Terminal & Transfer Railway—3 freights each way.

There is some variation in the total number of trains but the average daily total number is 12 each way.

## VI.

Winter Street extends in an easterly and westerly direction. The grade crossing in question at Winter Street is protected by two standard cross buck railroad warning signs conforming to the requirements of Section 192.29(5), Wis.Stats. These signs are located on both sides of the crossing and are visible on Winter Street for more than 100 feet on each side of the crossing. Winter Street is a brick paved city street and one-half mile east of the area involved herein runs through a main portion of the City of Superior. It is one of four streets giving access from the main portion of the city to the establishments which are referred to in Paragraph VII hereof as being located west of the area involved herein. The other three streets are Susquehanna Avenue, Maryland Avenue, both being city streets paved with gravel, and a cinder and gravel road maintained by the Great Northern Railway Company and known as "Great Northern Road". The Great Northern Road is about 75 feet west of its shops and railroad tracks and it is used by the public. There are no railroad tracks crossing these three streets. They are west of the Flour Yard Lead

and the Northwest Lead and they connect Winter Street and Belknap Street 2500 feet to the south. A viaduct extends over all railroad tracks on Belknap Street. Pedestrians have an additional access to the industries referred to by way of a viaduct over all railroad tracks at Third Street. Winter Street is not as heavily traveled as Tower Avenue and Belknap Street. There is no residential area to the west of the grade crossing.

There are no buildings or other obstructions located within 400 feet to the north of Winter Street for more than one-half mile on either side of the grade crossing, excepting a small flagman's shelter house which is located about 250 feet north of Winter Street. This shelter house is shown in Exhibit 3. The records kept by the defendant railway company show that from January 1, 1925, to April 15, 1951, there have been only two accidents at the Winter Street crossing, one involving automobile damages of $22.80 and the other a smaller damage to a fender and headlight. Neither accident resulted in personal injuries. In both of these cases the automobile ran into the side of cars which were occupying the crossing.

## VII.

The following are the names of business establishments located along and north of Winter Street and west of defendant's elevator tracks together with the number of persons employed at each such establishment:

| | |
|---|---|
| Reiss Coal Company Dock | 83 |
| Berwind Coal Dock and Briquet Plant | 115 |
| Standard Oil Lake Terminal | 10 |
| Ramapo Ajax Co. | 67 |
| Glen Rogers Briquet Plant | 21 |
| Carnegie Coal Co. Dock | 27 |
| Northwestern Hanna Co. Dock | 40 |
| Standard Oil Tanks | 3 |
| Stott Briquet Plant | 50 |
| Pure Oil Co. | 7 |
| Great Northern Freight Office | 60 |
| Great Northern Elevators X and S | 115 |
| Great Northern Flour Dock (no permanent crew—crews brought in when needed.) | |

## VIII.

A substantial amount of trucking is done from the establishments described in Paragraph VII and. a number of these trucks pass along Winter Street and cross the defendant's Flour Yard and Northwest Lead tracks. Among these are 30 gasoline and oil transport trucks going to and from the Standard Oil Tank facility making a total of 30 trips each way each day. About half of these use Maryland Avenue and the Great Northern road to Belknap Street and the other half use Winter Street. Additional trucks transport gasoline from the Standard Oil Tank facility to customers in Duluth and Superior. These trucking operations have been carried on in substantially the manner described above for at least the past twenty-five years.

## IX.

On Wednesday, April 25, 1951, a traffic count was made of trucks, automobiles and pedestrians using Winter Street and crossing defendant's elevator tracks. The count was made during the one hour period 7:45 A.M. to 8:45 A.M. and during the one hour period 1:15 P.M. to 2:15 P.M. The number crossing the defendant's elevator tracks in each direction are as follows:

| 7:45 to 8:45 A. M. | |
|---|---|
| Automobiles moving west | 93 |
| Automobiles moving east | 23 |
| Trucks moving west | 9 |
| Trucks moving east | 17 |
| Pedestrians moving west | 15 |
| Pedestrians moving east | 8 |

| 1:15 to 2:15 P. M. | |
|---|---|
| Automobiles moving west | 38 |
| Automobiles moving east | 29 |
| Trucks moving west | 22 |
| Trucks moving east | 20 |
| Pedestrians moving west | 7 |
| Pedestrians moving east | 11 |

As far as is known the traffic during these periods on April 25, 1951 was not substantially different from the traffic on January 12, 1949.

## X.

An order of the Interstate Commerce Commission dated June 6, 1910, modified the provisions of 45 U.S.C.A. §§ 1 to 10, inclusive, so as to require that whenever any train is operated with power or train brakes not less than 85 per cent. of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train and all power braked cars in every such train which are associated together with the 85 per cent. shall have their brakes so used and operated.

## XI.

The Flour Yard Lead and the Northwest Lead are each approximately 1600 feet in length. In the length of said leads there are numerous cross-over tracks, switches and derails; and from these two leads the two Pure Oil Company spur tracks (colored yellow on Exhibit 1), each approximately 700 feet in length, are reached. There are only 300 feet out of the 1600 foot length of these two leads where there are only two parallel tracks in the width of the yard. In the remaining 1300 feet of these two lead tracks there are three or more tracks, all as shown on Exhibit 1.

The Flour Yard Lead and Northwest Lead, in addition to serving as connecting tracks between the Flour and Elevator Yards and the Outbound and Twenty Yards, are also used extensively in performing switching operations within the component parts of the Superior Yard and in switching the Pure Oil Company spur tracks. The switch to the Pure Oil spur tracks (numbered 10 on Exhibit 1) is located on the Flour Yard Lead. Empty tank cars are stored in the Flour Yard prior to loading at the Pure Oil Company's loading rack located adjacent to the two spur tracks. In switching these tank cars from the Flour Yard to the Pure Oil spur tracks, the switching movement must proceed from a track in the Flour Yard over the Flour Yard Lead, past the #10 switch and then back through the #10 switch onto the Pure Oil spur tracks. Similarly, loaded tank cars are switched from the two spur tracks over the Flour Yard Lead and Northwest Lead to the Outbound Yard where they are classified and placed in road trains being made up or assembled on tracks in the Outbound Yard. These two leads are also

used when cars are switched from one track to another in the Elevator or Flour Yards.

## XII.

The general nature of the work done in the Superior Yard may be described as that of yard or switching service in connection with the movement of freight cars whose road run has terminated or which will commence at a future time. The work in the Superior Yard is performed by yard or switching crews and paid for at yard or switching service rates. The crews use switching engines, as distinguished from road service engines, in the yard. The work is performed under the supervision of a yardmaster and not under the supervision of a trainmaster or train dispatcher. There are no block signals or other wayside signals used in the. Yard in connection with these operations, except the semaphore at the L. S. T. & T. railroad crossing. Nor are time tables or train orders used in these movements. All movements in the Yard are conducted under what is known as the "Restricted Speed Rule", which applies only to movements within yard limits, and which reads as follows: "Proceed prepared to stop short of train, obstruction, or anything that may require the speed of a train to be reduced."

## XIII.

The operating rules of the Great Northern define a train as "an engine or more than one engine coupled, with or without cars, displaying markers". In railroad parlance a train is an engine, displaying markers, with or without cars coupled to it, which runs between separate stations on the railroad or between separate and distinct yards, such as between the Superior Yard and the Allouez Yard, as directed by time tables or train orders, or both. These train movements are under the supervision of the train dispatcher and trainmasters. The train crews are road crews, paid at road service rates. Markers, which are colored lamps, are displayed on the rear of the cabooses.

## XIV.

No passenger cars or passenger trains are operated over the defendant's tracks within the Superior Yard. Passenger trains of the defendant which run between Superior and Duluth are operated over the mainline of the Northern Pacific which is shown on Exhibit 1 to the east of the Superior Yard.

There is no through movement of freight trains through the Superior Yard. Incoming freight trains from points south and west of Superior are broken up in that part of the Superior Yard which lies south of Winter Street. In breaking up these incoming freight trains any cars destined for delivery at Duluth are assembled by a yard switching crew on a designated track or tracks in the yard. When a number of Duluth cars have been so assembled another engine and crew hauls these cars over to Duluth in the following manner: A caboose, displaying markers, is coupled to the rear end of the group of cars and the engine is coupled to the front end. The air brakes are then connected up on 85% or more of these cars and the movement proceeds northward in the Superior Yard over the Northwest Lead to a switch at H.B. 25 plus 10, as shown on Exhibit 1, at which point it proceeds on the "old main line" to elevator station. The "old main line" is a name carried over from the time, over 40 years ago, when through passenger trains were operated through the Superior Yard. Elevator station, as shown on Exhibit 1, is not a station in the defendant's published tariffs, but is merely a name designation for the point at which the Superior Yard connects with the main line of the Northern Pacific. At elevator station, there is a derail and the movement onto the Northern Pacific main line is directed by a block signal semaphore located near the derail. The movement then proceeds over the Northern Pacific main line a distance of approximately 4.8 miles to the Great Northern Yard and freight house in Duluth. This movement is designated by the defendant's operating officials as a "combination transfer and switch job."

On the return movement from Duluth the engine and crew will haul back empty and loaded cars from the Great Northern Yard or freight house in Duluth to the Outbound Yard in the Superior Yard at which point the cars are left standing on a

yard track where they will later be classified or switched out by another switching crew, the empty cars being placed on storage tracks and the loaded cars being placed in outgoing freight trains.

In accomplishing the above described movement of cars the Northwest Lead is used, in part, between the Outbound Yard and elevator station. The Northwest Lead was also used for distances of 540 feet in the movement of the 12 cars on January 12, 1949, as shown on Exhibit 1.

The number of cars thus moved to Duluth will vary between 28 and 55 cars, not including the engine and caboose. During the shipping season when the Duluth-Superior Harbor is open, the number of cars that can be hauled to Duluth in any one movement is restricted to 28, since the Northern Pacific main line crosses two drawbridges over the harbor and a greater number of cars at one time would unduly interfere with the movement of boats through the drawbridges. The movement of all trains on the Northern Pacific main line from elevator station to and over the two drawbridges is controlled by interlocking signals. In addition to the "combination transfer and switch job", which operates on the average of 10 times a day each way, the Northern Pacific main line is used by Northern Pacific freight and passenger trains, by Great Northern passenger trains, and by Chicago, St. Paul, Minneapolis and Omaha Railway passenger and freight trains.

## XV.

The principal work in the Superior Yard is the handling of grain cars for Great Northern Railway Company's elevators "X" and "S", which are located at the northeast end of the Yard, as shown on Exhibit 1. These elevators are operated as a unit and as such constitute the largest elevator in the United States. 25,857,254 bushels of grain (15,364 cars) in 1948 and 34,643,310 bushels of grain (19,356 cars) in 1949 came into the Superior Yard for unloading at these elevators. These elevators are "fast" elevators in respect to unloading grain from cars and loading grain onto boats for trans-shipment on the Great

Lakes. During the peak movement in the fall of 1948, 5,765 cars were unloaded in the month of September at these elevators. Elevator "X" is equipped with an automatic car dumper which picks up loaded grain cars and tilts them in several directions dumping the grain into an open pit.

The grain cars come into Superior, Wisconsin, in road trains which terminate in a portion of the Superior Yard. The trains are broken up in the Twenty Yard by switching crews and several cars at a time are moved a few thousand feet down to the Flour and Elevator Yards. On these movements the engine is usually coupled on to the southerly end of the cars and pushes them *down grade* to the elevators. Because the engine is to the rear of the cars pushing them, and because it is down grade, the defendant's superintendent has directed that the air brakes be connected on 85% of the cars in such movements. · During the winter months cars are sometimes loaded with grain at these elevators for outbound shipment. After the cars are loaded or unloaded they are pulled from the elevator house tracks and brought back to the Outbound Yard where they are classified, the empties being stored on certain tracks and the loaded outbound cars being placed on other tracks on which they are assembled into road trains. In the case of these latter movements, the engine is coupled to the leading end of the cars and pulls them *up grade* from the elevators. On these movements the air brakes are not connected.

Switch engines and switch crews are used to handle all of the movements above described. No caboose is used by the crew or attached to the engine or the cars while performing these movements. No markers are displayed by the switch engine in making these movements. In accomplishing the southbound movements from the Flour and Elevator Yards the crews will often attach to the box cars, one or more tank cars which, enroute to the Outbound Yard, will be spotted on the Pure Oil Company's spur tracks, as described in Paragraph XI above.

## XVI.

The movement of the 12 cars in question was accomplished by a switch engine

and switch crew that commenced work in the Superior Yard on the morning of January 12, 1949, at 8:00 o'clock a. m. The engine, No. 1173, was put out in the Twenty Yard and the first movement made was of approximately 20 cars, which were standing on Track #29 in the Twenty Yard, to the Elevator Yard. Of these 20 cars, 3 or 4 were empty tank cars. When the draft of 20 cars arrived at the Elevator Yard, the movement was stopped and the empty tank cars were uncoupled from the draft and switched to a storage track in the Flour Yard. The remaining 16 or 17 cars, being loaded with grain, were spotted for inspection by the State of Wisconsin Grain Inspector. While these grain cars were being inspected the switching crew moved down into the Elevator Yard, with the engine alone, onto House Track No. II serving Elevator "S" (as indicated on Exhibit 1). On House Track II they coupled their engine onto 5 cars and pulled them away from the elevator out into the Elevator Yard. Without detaching these 5 cars the switching crew then moved in on Track No. 18 (as indicated on Exhibit 1) and there picked up an additional 5 cars. With these 10 cars attached to the engine the switching crew then moved southerly over Track No. 17 in the Elevator Yard onto the Northwest Lead to a point south of the switch for Track No. 15, at which point the movement came to a stop, the switch was thrown, and the 10 cars were pushed northward onto Track No. 15 where they were coupled together with 2 cars which were then standing on Track No. 15. The switching crew then detached the engine from these 12 cars, moved southward and coupled onto the 16 or 17 loaded cars which had been set out for inspection and shoved them northerly to Elevator "S" and spotted them on House Track No. II where they were left to be unloaded.

At this point, at about 12:10 p. m., the actions of the crew came under the observation of the Government inspectors, when the crew again coupled their engine, No. 1173, to the 12 cars which had been assembled, as previously described, on Track No. 15, and without coupling up the air brakes, moved the 12 cars from Track No. 15 over the Northwest Lead and the Flour Yard Lead to the No. 8 Lead in the Outbound Yard. The movement proceeded from Track No. 15 in the Elevator Yard over the Northwest Lead to a point indicated on Exhibit 1 by Switches Nos. 6 and 7, approximately 1300 feet from Track No. 15, where it crossed over to the Flour Yard Lead. The movement then continued southward on the Flour Yard Lead. After moving approximately 1500 feet the engine and cars slowed down just north of the L. S. T. & T. Railroad crossing, and in response to a signal from the flagman at the crossing, the movement then proceeded over the railroad crossing. South of the railroad crossing it crossed back again to the Northwest Lead where the movement slowed down to about 2 miles per hour while one of the members of the switching crew walked ahead of the engine to line Switch No. 12 immediately north of the Winter Street Crossing, to enable the movement to pass onto the Northwest Lead. The movement then passed over the Winter Street grade crossing at a speed of approximately 3 miles per hour, and came to a stop 300 feet south of Winter Street in order to enable a member of the switching crew to remove a derail from the track and at the same time to line the switches (Nos. 15 and 16) so that the movement could come in on No. 8 Lead in the Outbound Yard. The movement then started up again and moved a distance of approximately 850 feet onto No. 8 Lead. At this point and at about 12:20 p. m., the movement stopped, having come a total distance of 4500 feet from Track No. 15 in the Elevator Yard. At this point the Government inspectors left the engine and ceased their observations of the movement.

The engine was then cut off and by proceeding southward on the No. 8 Lead and switching back on other yard tracks, as indicated on Exhibit 1, the engine came up behind the cut of 12 cars and, without coupling up the air brakes, pushed them southerly down the No. 8 Lead in the Outbound Yard an additional 1200 feet where the switching crew proceeded to classify, or sort out, the 12 cars. In a series of several movements, 7 of the 12 cars were

switched onto Track No. 16 in the Outbound Yard on which track a road train, which was destined for Minneapolis, was being made up. The other 5 cars by a series of movements were switched to Track No. 10 in the Outbound Yard where they were to be held awaiting the completion of the billing. Then the switching crew and Engine No. 1173 went down to the Elevator Yard and again resumed work of the same character described above.

The total distance of the movement alleged in the complaint, from Track No. 15 in the Elevator Yard to No. 8 Lead in the Outbound Yard, was approximately 4500 feet. At no time did the speed of this movement exceed 6 miles per hour. No caboose was connected to engine No. 1173 or any of the cars at any time during the movements described herein. Nor were any markers displayed on the engine or on any of the cars. The crew did not operate under a time table or train orders in accomplishing this movement, but were acting under the direction of the yardmaster.

## XVII.

Engine 1173, and other engines used in the Superior Yard, are equipped with (1) an independent or power driving wheel brake and (2) appliances for operating air brakes on the cars when the air hoses are connected. An independent or power driving wheel brake applies braking power to the wheels of the locomotive alone. The train line or air brakes apply braking power to the engine and such cars of the draft as have their air line hoses connected to each other and to the engine. The latter type brakes are those which are required by 45 U.S.C.A. § 1, et seq., in the case of train movements as distinguished from switching movements. The independent brake operates on the wheels faster than do the air brakes for the reason that the activation of the air brakes is backward from the engine to the rear of the cars, whereas the independent brake operates directly on the driving wheels of the locomotive. This backward movement of the air in the air hoses is at the rate of 750 feet per second. The length of engine 1173 and the 12 cars was 610 feet.

The 12 cars attached to engine 1173 on January 12, 1949 were loaded cars. Based upon tests run with engine 1173 and 12 loaded cars on the Flour Yard Lead, heading south, on May 4, 1949, the following data was obtained:

At a speed of 6 miles per hour for engine 1173 and 12 cars, the movement could be completely stopped in a distance of approximately 61 feet by use of the independent brake alone. At the same speed the air brakes would stop the movement in a distance of approximately 43 feet or a difference of only 18 feet. At a speed of 3 miles per hour, there would be little difference, if any, in stopping distances between the two types of brakes. These tests were conducted without the use of the common hand brake.

## XVIII.

If air brakes are required to be used on the type of movement involved in this case, the following is a description of the method of connecting and disconnecting the air brakes:

After the switch engine is coupled to the cars, the air hoses must be connected between all of the cars and the engine by an additional employee, a car inspector, who would connect them manually. Then the car inspector would signal the engineer and the latter would start the equipment which mechanically pumps air into the air reservoirs on each of the cars. This pumping up of the air requires approximately 8 minutes on a draft of 12 cars. Then the car inspector signals the engineer to apply the air brakes and he then walks the entire length of the cars to check the air brake equipment and to ascertain that all the air brake pistons are extending from the brake cylinders on each car. Assuming that none of the equipment is found to be out of order, the car inspector then signals the engineer to release the air brakes, and he then repeats his inspection trip to ascertain that all the pistons have returned to the brake cylinders on each car. If all equipment is in order, he will so advise the engineer and switch foreman. This entire procedure would take approximately 20 to 30 minutes to complete on a cut of 12 cars.

When the movement has completed its trip to the other part of the yard, the cars must be "bled" before the cars can be shunted about or classified. "Bleeding the cars" is the act of releasing all the air from the air brake reservoirs and uncoupling the air hoses. The air is released by a car inspector who walks the length of the cars and pulls out a "bleed rod" on each car which allows the air to escape. On a draft of 12 cars this procedure would require about 12 minutes.

### XIX.

If air brakes are required in movements of the kind involved in this case, then there will be considerable delay and additional expense incurred in the handling of grain in the Superior Yard. Additional employees will be required to connect the air hoses on the cars, make air tests and to bleed the air from the cars. It will require additional car inspectors, additional engine crews and switching crews, and additional locomotives, costing in the aggregate about $24,-179.66 for each year over and above the present cost of operations in the Superior Yard. If air is required there will be additional delays and resulting expense which are not capable of computation, such as delays in getting the empty cars into road trains and returning them to the grain fields, delays to the elevators while switching and engine crews are waiting for the air hoses to be connected, air tests to be made and air to be pumped up, and delays due to the congesting of leads which will prevent other switch and engine crews from performing their work.

These delays in getting the empty cars into road trains and returning them promptly to the grain fields will cause hardship to the railroad, to terminal and country elevator operators, and to the farmers who grow the grain, especially during the three-month peak season of August, September and October of each year. These delays would aggravate car shortage and manpower shortage conditions currently present on the Great Northern Railway Company system.

### XX.

Operations similar to the movement of cars which is the subject of this action have been carried on by defendant for over 50 years and inspectors of the Interstate Commerce Commission have from time to time inspected operations of the defendant in the Superior Yard. The complaint herein is the first contention made by the Interstate Commerce Commission that these particular operations are in violation of the air brake provisions of the Safety Appliance Act.

### XX1.

The movement of the locomotive and 12 cars on January 12, 1949, complained of in the complaint on file herein, was a switching movement and not a train movement. The work was done by a switching crew without a caboose or markers and they were engaged in switching, sorting, classifying and assembling cars in the railroad yard for the purpose of making up a train.

### XXII.

The movement, being a switching movement, was not subject to those provisions of the Safety Appliance Act which require that 85 per cent. of the cars have their air brakes connected and used.

### Conclusions of Law

### I.

The Court has jurisdiction over the parties and subject matter of this action.

### II.

■ The essential nature of the work done establishes that the movement by the defendant of 12 cars on January 12, 1949, was that of switching, sorting, classifying and assembling cars all within a single railroad yard for the purpose of making up a train. As such, the movement was a switching movement and not a train movement.

### III.

■ The defendant did not violate the provisions of the Safety Appliance Act, U.S.C.A., Title 45, §§ 1 to 10, inclusive, as modified by an order of the Interstate Commerce Commission of June 6, 1910, requiring that whenever any train is operated with power or train brakes not less than 85 per cent. of the cars of such train shall have their brakes used and operated by the

engineer of the locomotive drawing such train, and all power-braked cars in every such train which are associated together with the 85 per cent. shall have their brakes so used and operated.

## IV.

The defendant is entitled to judgment dismissing the action on the merits.