**UNITED STATES of America,**
**Appellant,**
v.
**SEABOARD AIR LINE RAILROAD**
**COMPANY, Appellee.**
No. 7534.

United States Court of Appeals
Fourth Circuit.

Argued March 6, 1958.

Decided June 30, 1958.

Opinion of Circuit Judge Sobeloff Filed
July 10, 1958.

Edwin J. Slipek, Asst. U. S. Atty., Richmond, Va. (L. S. Parsons, Jr., U. S. Atty., Norfolk, Va., and Henry L. Hilzinger, Atty., Interstate Commerce Commission, Washington, D. C., on the brief), for appellant.

Lewis Thomas Booker and Eppa Hunton, IV, Richmond, Va. (Hunton, Williams, Gay, Moore & Powell, Richmond, Va., on the brief), for appellee.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and WILLIAMS, District Judge.

HAYNSWORTH, Circuit Judge.

This is a proceeding under § 6 of the Safety Appliance Act (45 U.S.C.A. § 6) to collect the statutory penalties for violations of the Act. The violations are said to have occurred when, on four occasions, the railroad moved cars without coupling their brakes so that they could be operated by the engineer. It is admitted that, in each instance, the only operable brakes were those upon the engine, so the only issue is whether or not the movements were train movements

within the contemplation of the Act (45 U.S.C.A. § 9) and the supplementary orders of the Commission.

In distinguishing between "train movements," in which the brakes of the cars must be coupled and operable, and switching movements, in which they need not be, courts have considered so many circumstances as affecting the character of the movement that we should first refer to the trackage and operations of the Seaboard in Hopewell, Virginia, where the movements occurred.

Hopewell, Virginia, is served by a branch line of the Seaboard which connects with the main line at Bellwood and terminates at Hopewell. Incoming trains from Bellwood arrive at a classification yard where they are broken up and from which the cars are distributed to consignees in Hopewell. Much of the distribution is effected over a lead track, which winds through the industrial section of Hopewell for a total distance of approximately two miles. Nine spurs, springing from the lead track, serve industrial customers whose plants are adjacent to them, and some of them are used for car storage. The spur, or customer lead, track most distant from the classification yard serves a plant of Continental Can Co., while the one second in distance from the classification yard serves a plant of the Allied Chemical & Dye Co. A track for the interchange of traffic with the Norfolk and Western also springs from the lead track at a point approximately midway between the classification yard and the end of the lead at Continental Can Co.

The Norfolk and Western has lead tracks paralleling the Seaboard lead throughout most of the length of the latter, and several of the Norfolk and Western industrial spurs cross the Seaboard lead track. At such crossings, the Seaboard has the right of way, and Norfolk and Western crews must bring their engines to a complete stop before crossing the Seaboard lead track. The leads of both railroads cross several streets and private ways. The crossing of one of these streets, a state highway carrying a substantial amount of traffic, is protected by a watchman and manually operated gates. The crossings of other streets and ways are protected only by stationary signs.

There is no perceptible grade on the Seaboard lead, and all movements over it are at yard speeds and under yard control. It is a part of the Hopewell Yard, and serves no purpose other than the distribution of cars from inbound trains broken up in the classification yard and the assembly of cars to be made up, in the classification yard, into outbound trains.

When an incoming train has been broken up in the classification yard, a switch engine couples on to those cars which are to be delivered over the lead track. Acting under orders of the local freight agent, the switching crew proceeds to distribute the cars over the lead track. Those consigned to customers on Seaboard spurs are spotted on the appropriate spur, while those destined to points on the Norfolk and Western are placed upon the interchange track. Because of the specialized needs for different types of cars,[1] the crew may be required, en route, to pick up cars from storage tracks and place them upon other spurs for loading. On the return trip,[2] the switching crews pick up from the spurs loaded outbound cars and empty cars for which the customer has no need, and, from the interchange track, cars which had been placed there by the Norfolk and Western for delivery to the Seaboard. These cars are then distributed to storage tracks breaking from the lead track or to the classification yard as circumstances may require. Outbound cars

1. Most of the material delivered to Allied Chemical & Dye, for instance, is in coal hopper cars and boxcars, but most of its product is shipped out in tank cars.

2. It is possible that the operation in the two directions may overlap to some extent. If cars are to be delivered to a spur and other cars picked up from the same spur, it may be that both operations would be performed at the same time, but the record before us does not disclose the practice here.

are then made up in the classification yard into an outbound train.

No question has been raised about any movement in either direction over the lead track during which the crew worked a spur relatively near the classification yard. It is asserted, however, that an isolated movement in either direction becomes a train movement if only the more distant spurs are worked. Thus, the charges here are based upon two movements from the classification yard to the Continental Can lead track without intermediate stops and upon two movements from the Allied Chemical lead track to the classification yard during at least one of which there was an intermediate stop en route to pick up additional cars from the interchange track.[3]

The fact that less than all of the nine spurs may be worked during a particular movement has no controlling significance. Nor do we believe the answer is to be found in an identification of the spurs actually worked. The nature of the work, its purpose and character are precisely the same, whether every other spur is to be worked, only those between the classification yard and the interchange track or only those, or one of them, between the interchange track and the end of the lead track. Whether these spurs are to be worked or those, the business of the switch engine and its crew here is the distribution of cars from trains which have completed their over-the-line run and the collection and assembly of cars to be made up into outgoing trains.

■ Nor do we accept the Government's contention that "since the defend-

ant moved (cars) between designated points in its yard for a distance of about 2 miles without picking up or setting out any car en route," the movement must necessarily have been a train movement requiring operable train brakes. Substantially every switching operation involves such movements, many for comparable distances, but they take on the appearance of train movements only when lifted from their context of switching operations and separated from their function and purpose. It is not enough, ignoring what transpires before and what follows, to say that cars were moved from this point to that; the character of the operation is to be determined by a look at the whole and with due regard to all elements of its setting.

Thus viewed, we agree with the District Court that these movements were properly classified as switching movements. In the average day there were ten of such movements, and they do not fall into separate categories solely upon the basis of a classification, in terms of relative distance from the classification yard, of the spurs worked. The lead track, the spurs that break from it and the classification yard are all parts of one yard, and its extremities are not so distant as to deprive a movement from one end of the yard to the other of the flavor of its function in breaking up and making up trains.

Unlike other sections of the Safety Appliance Act which apply to the use or haulage of a locomotive or a car, the train brake provisions apply only to the running of trains. The difference in language is an appropriate expression of Congressional intention, in the adoption

---

3. On one of the movements toward the classification yard, the engine left the Allied Chemical lead track with twenty-nine loaded cars, stopped at the interchange track to pick up six loaded and fourteen empty cars and arrived at the classification yard with forty-nine cars. On the other questioned movement in that direction, records of the railroad indicate the engine left the Allied Chemical lead track with four loaded and one empty car, stopped at the interchange track to pick up one loaded and twenty

empty cars and arrived at the classification yard with twenty-six cars, but an inspector for the Commission had testified that all twenty-six cars were moved from the Allied Chemical lead track without a stop at the interchange track.

The two movements from the classification yard to the Continental Can lead track were of twenty-eight and twenty-three cars, respectively. In each of these movements, some of the cars were ahead of the engine and others were behind it.

of the train brake provisions, to distinguish between an over-the-line run, during which the need of useful train brakes was great and obvious and compliance with the requirement would not unduly hinder railroad transportation, and switching operations, during which there is little or no need for train brakes and general and strict compliance with the requirement would be impossible or highly impractical. The distinction was pointed out by the Supreme Court in the first case involving the train brake provisions to come before it. United States v. Erie Railroad Company, 237 U.S. 402, 35 S.Ct. 621, 59 L.Ed. 1019, and, a week later, the Supreme Court declared the controlling test to be "the essential nature of the work done." United States v. Chicago Burlington & Quincy Railroad Company, 237 U.S. 410, 35 S.Ct. 634, 636, 59 L.Ed. 1023.

■ But movements of trains and cars are so varied that the distinction between the fast, through train and the simplest switching operation is not always easily applied. Functionally, a transfer movement between separated yards may be a switching operation, but, particularly if it moves over main line tracks, it has elements of similarity to movements between major terminals and many of the underlying reasons for the train brake requirement are present. Train brakes are usually required in such movements. United States v. Erie Railroad Company, 237 U.S. 402, 35 S.Ct. 621, 59 L.Ed. 1019; United States v. Chicago, Burlington & Quincy Railroad Company, 237 U.S. 410, 35 S.Ct. 634, 59 L.Ed. 1023; Louisville & Jeffersonville Bridge Co. v. United States, 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757; United States v. Northern Pacific Railway Company, 254 U.S. 251, 41 S.Ct. 101, 65 L.Ed. 249; Chesapeake & O. R. Co. v. United States, 4 Cir., 226 F. 683; Illinois Central R. Co. v. United States, 8 Cir., 14 F.2d 747; Chicago & E. R. Co. v. United States, 7 Cir., 22 F.2d 729; United States v. Southern Pacific Co., 9 Cir., 60 F.2d 864; United States v. Southern Pacific Co., 9 Cir., 100 F.2d 984. Movements for the distribution and collection of cars have been held subject to the train brake provisions when conducted over main line tracks, United States v. Panhandle & Santa Fe Ry. Co., 5 Cir., 203 F.2d 241; United States v. Thompson, 8 Cir., 252 F.2d 6, but similar movements over yard tracks have generally been held to be exempt switching operations. United States v. Great Northern R. Co., 9 Cir., 73 F.2d 736; United States v. New York, C. & St. L. R. Co., 7 Cir., 77 F.2d 215; United States v. Elgin, J. & E. Ry. Co., 7 Cir., 182 F.2d 1; United States v. Chicago, Burlington & Quincy R. Co., 7 Cir., 199 F.2d 223; United States v. Pennsylvania Railroad Co., D.C.Md., 80 F.Supp. 965; United States v. Great Northern Ry. Co., D.C.W.D.Wis., 103 F.Supp. 889; United States v. Staten Island Rapid Transit Railway Company, D.C.E.D.N.Y., 151 F.Supp. 911. Cf. United States v. South Buffalo R. Co., 2 Cir., 168 F.2d 948. Even though the movements with which he was concerned were over main line tracks, Judge Hutcheson, now Chief Judge of the Court of Appeals for the Fifth Circuit, held that the train brake requirements were inapplicable because of the short distances between the spurs to be worked. United States v. Texas & N. O. R. Co., D.C.S.D.Texas, 13 F.2d 429.

■ The movements here were not over main line tracks, nor even inter-yard connecting tracks. They moved, entirely within the confines of one yard, over a lead track only two miles long from which there sprang nine spurs and an interchange track. Since the nature of the work was clearly the distribution and collection of cars following the breakup of trains and preparatory to the make-up of others, we are convinced they were switching operations, exempt from the requirement of train brakes.

The classification of cars, narrowly considered, is but one of several exempt switching activities. Spotting cars upon a team track alongside classification tracks is equally exempt. Delivering cars to spurs is no less typical of switching than classification, and the considera-

tions which exclude the one from the train brake requirement are applicable to the other. Movements over the lead track, from one spur requiring attention to the next, are an inseparable part of the switching activity, when the lead track is used, in fact, as an integral part of a yard in which the cars have been received or from which they are to be dispatched. Nor can we say, having due regard for the nature of the track, its connections and its use, that two miles is an unreasonable distance to travel without train brakes, when the "nature of the work done" is so clearly switching.

■ Much of the emphasis in the submission of the case has been upon the crossings of streets and of spurs of the Norfolk and Western, the Government pointing to them as potential hazards, while the railroad advances its safety record under the precautions of yard rules and asserts that the use of train brakes will increase, rather than minimize the risk of injury to trainmen, for they will be required to pass between the cars to couple the hose. Consideration of such crossings of streets and tracks is not irrelevant, for they are a part of the physical setting in which the movement must be viewed in order to determine its nature and character. A switching operation does not cease to be a switching operation, however, merely because the movement crosses a highway or spur track. Many an industrial spur crosses a public or private way, but spotting a car on such a spur does not become a line haul on that account. Movements over or across main line tracks may stand upon a different basis, where the switching movement becomes a potential hazard in the operation of main line trains, but crossing other yard tracks is a common incident in switching and their ownership by another railroad is not a significant circumstance.

It is not contended here that the Act properly or rationally may be construed to require the use of train brakes on every switching movement which crosses streets or highways or the yard tracks of another railroad. On the contrary, it is conceded that movements over these same crossings are exempt from the requirement if shifting is done relatively near the classification yard, a circumstance having no relation to the suggested hazard of the crossings. Whether or not a car has been placed upon a particular spur, the risk of collision with vehicular traffic at Randolph Street, and the other crossings, is precisely the same.

■ Where Congress has commanded the use of train brakes, the courts cannot excuse a failure to use them because of the use of other devices and measures, however effective in assuring safety they may be. If it were accepted that the Act should be construed to require train brakes whenever their use would contribute substantially to the safety of operations, an appraisal of the effectiveness of other measures would be necessary to decision, but it is not even contended that the Act has any such meaning.

Equally irrelevant, if Congress has required the use of air brakes, is consideration of the substantial cost to be imposed upon the railroad and of delay in the handling of freight. But if the use of train brakes on these movements is costly, delays shipments and creates new risks of injury without substantially contributing to the alleviation of existing risks, it is a reminder that courts should not extend the requirement beyond the intention of the Congress or needlessly chip away major portions of the long established exemption of switching operations.

Affirmed.

SOBELOFF, Circuit Judge (concurring in part and dissenting in part).

After four and one-half years of operating its railroad cars between the Hopewell classification yard and the plants of the Continental Can Company and Allied Chemical & Dye Company in compliance with the airbrake provisions of the Safety Appliance Act (45 U.S. C.A. Sec. 9), the defendant, in March, 1956, ceased using airbrakes. I cannot agree that the change in practice was legally justified, and after consideration

of the very persuasive majority opinion, I am nevertheless constrained to dissent from the holding that none of the four movements in question constitutes a "train" movement within the meaning of the Act. As to three of them at least, those in which there was no picking up or shunting of cars en route,[1] the Act seems clearly applicable.

The facts of the case have been painstakingly stated and, with few exceptions, require no amplification. These exceptions are, however, crucial. It should be mentioned as more than coincidence that three of the four movements were accomplished without stops en route. The defendant's own evidence is that Seaboard's agent at Hopewell, Mr. Morrison, customarily receives lists from the various industrial plants along the line, informing him of the cars to be picked up by Seaboard. The "yard people" are then issued instructions as to the cars to be moved to and from the plants. Therefore, as to the first movement in question (count number 1), when Seaboard's crew coupled together an engine and 26 cars at the Allied Chemical and Dye Company plant on March 5, 1956, it was known to them that they would proceed, non-stop, for a distance of two miles, and, in the second movement on that day (count number 2) and the one in question which occurred the next day (count number 4), 28 and 23 cars, respectively, were assembled for uninterrupted two-mile runs from the Hopewell classification yard to the Allied Chemical and Dye Company and the Continental Can Company's plants. Except for their role in the topographical setting, therefore, the presence of a number of other closely-spaced industrial spurs which may, at different times, be worked is irrelevant to this case. The fact that, on other occasions, frequent stopping and shifting of cars might make the process of coupling and uncoupling airbrakes utterly impractical, is equally unimportant so far as the movements here involved are concerned. This feature of the case should not be ignored.

The question, then, is whether a train, to be subject to the Act, may consist of a locomotive and 23 or more cars which have been either assembled from incoming trains or picked up at one location, and which are to proceed, non-stop, for a distance of approximately two miles, where, at their destination, they are either unloaded or reassembled into outgoing trains.

In terms, the Act requires airbrakes to be used on "all trains * * * used on any railroad." As my colleagues have observed, however, the Supreme Court, in a series of four cases, drew a distinction between "train" and "switching" operations, ruling that the airbrake requirement was inapplicable to the latter, and declaring the test to be "the essential nature of the work done."

The character and extent of the "switching" exemption, and the relative weight due the various criteria in the application of the "essential nature" test, can best be ascertained by examining and appraising the various contexts in which they were judicially created and authoritatively applied. Resort to the Supreme Court cases, in some detail, becomes necessary.

The first was United States v. Erie Railroad Company, 237 U.S. 402, 35 S.Ct. 621, 624, 59 L.Ed. 1019, decided by a unanimous Court in 1915. The defendant railroad operated a freight yard at Bergen, New Jersey, where regular eastbound freight trains were stopped and broken up and regular westbound freight trains made up and started. Following the break-up of the eastbound trains, and before the assembly of westbound trains, temporary groupings of cars, known as "transfer trains," were made up and moved to and from two other freight yards. The first, the Jersey City yard,

---

1. Although there was a conflict in the evidence whether one or two of the movements were interrupted by switching operations en route, the District Judge resolved the conflict by finding a stop for switching in only one of the four, the one alleged as the third violation.

was located two miles from Bergen, and the other, the Weehawken yard, three and one-half miles from Bergen. The trains ran only between these yards, usually had about twenty-five cars, carried no caboose, were operated by crews and engines specially engaged in that service, and at irregular intervals under the orders of yardmasters, at speeds of seven to eighteen miles per hour. Without using the requisite number of air-brakes, nine transfer trains were hauled from Jersey City to Bergen, six from Bergen to Weehawken, two from Weehawken to Bergen, and one from Bergen to Jersey City. These operations, similar to the ones in question here, were held to be train operations within the meaning of the Safety Appliance Act.

It is, of course, arguable that a distinction exists between the work done in Erie and the instant case, in that the cars here were being hauled to and from their ultimate consignees, whereas in the Erie case, the cars received by the Jersey City and Weehawken yards were then to be delivered further to their industrial and commercial consignees. Such a distinction, if suggested, would not be a valid one, and the Erie opinion itself refutes it. In summing up the decision in Erie, the Court, through Mr. Justice Van Devanter, said: "We therefore conclude and hold that it [the air-brake provision of the Safety Appliance Act] embraced these transfer trains. Its applicability to this class of trains was considered and sustained in   *   *   * United States v. Pere Marquette Railroad Co., [D.C.W.D.Mich.1913], 211 F. 220 *   *   *." The approval and adoption by the Supreme Court of the decision in Pere Marquette is significant, because the District Court held in that case that the transfer of a string of 17 cars, assembled from incoming trains which had been broken up, for a distance of two miles within the general yard limits of the City of Grand Rapids, the cars to be unloaded at their destination, constituted a "train" movement within the meaning of the Safety Appliance Act. Thus, as early as the Erie case, it was decided that a "transfer train" may consist of a string of cars hauled a short distance for unloading as well as further forwarding.

A week after its decision in Erie, the Supreme Court rendered its decision in the second of the pertinent cases, United States v. Chicago, Burlington & Quincy R. Co., 1915, 237 U.S. 410, 35 S.Ct. 634, 59 L.Ed. 1023. Again dealing with transfer trains hauled for a short distance (2 miles), this time around Kansas City, Missouri, the Court concludes that the trains in question were "exposed to the hazards" which the airbrake provision "was intended to avoid or minimize," and the movements were held to be train movements. 237 U.S. at page 412, 35 S.Ct. at page 635. The railroad argued that the work of moving the transfer trains was being done by switching crews, and in answer to this contention, the Court formulated what has become known as the "essential nature" test: "Neither is it material that the men in charge were designated as yard or switching crews, for the controlling test of the statute's application lies in the essential nature of the work done rather than in the names applied to those engaged in it." 237 U.S. at page 413, 35 S.Ct. at page 636.

In the third of the Supreme Court decisions, Louisville & Jeffersonville Bridge Co. v. United States, 1918, 249 U.S. 534, 39 S.Ct. 355, 356, 63 L.Ed. 757, moving, for a distance of three-quarters of a mile, a string of 26 cars which had been assembled for delivery to another railroad, was held to be a train movement. Mr. Justice Clarke, writing for the Court, stated: "An engine and twenty-six cars, assembled and coupled together, not only satisfies the dictionary definition of a 'train of cars', but would certainly be so designated by men in general, and in any fair acceptation of the term must be regarded as constituting a train within the meaning of the statute." 249 U.S. at page 538, 39 S.Ct. at page 356. Discounting the argument that the work done was merely part of a switching operation, Justice Clarke pointed out

that the features considered generally as constituting exempt switching movements, were not present: "The work done with the cars, as described, was not a sorting, or selecting, or classifying of them, involving coupling and uncoupling, and the movement of one or a few at a time for short distances, but was a transfer of the 26 cars as a unit from one terminal into that of another company for delivery, without uncoupling or switching out a single car, and it cannot, therefore, with propriety, be called a switching movement." 249 U.S. at page 538, 39 S.Ct. at page 356.

Finally, in United States v. Northern Pacific Ry. Co., 1920, 254 U.S. 251, 41 S.Ct. 101, 65 L.Ed. 249, the Supreme Court was presented with a fact situation almost identical to the one in question here, and again without dissent, the Court held that the movements involved constituted train movements. The history of the Northern Pac. case is interesting for two reasons. First, the facts are more fully developed in the Court of Appeals opinion and, second, the Court of Appeals, which was reversed, took the same approach to the case as have my colleagues here.

South of the main tracks at Duluth, Minnesota, were several tracks known as the "Duluth Terminal" or "D. T. Tracks." They were operated as a single yard, and no part of them was ever used by any trains running between stations, freight or passenger, but, as in our case, they were used "exclusively * * * to supply the industries along these tracks with loaded cars or empties to be loaded for outgoing freight, for delivery to the main line." 8 Cir., 255 F. 655, 657, 658. The trains were not operated according to fixed schedules, but were moved under the yardmaster's orders at such speeds that they could be stopped at vision. Two strings of freight cars, consisting of 40 and 48 cars, respectively, were run along this line for a distance of approximately 4 miles at speeds varying between three and eighteen m. p. h. The Court of Appeals for the Eighth Circuit thought the earlier Supreme Court cases

distinguishable in that the movements involved in those cases were along main line tracks and not devoted exclusively to the servicing of local industries. Affirming a directed verdict for the defendant railroad, the Eighth Circuit held: "From these facts no other conclusion can be reached than that of the learned trial judge, that these train movements were mere switching operations, and therefore not within the air-brake provision of the act of Congress, as determined in the Erie and Chicago, Burlington & Quincy Railroad cases, supra." 255 F. 655, 658.

The Supreme Court, in an opinion by Justice Brandeis, disagreed. It held that the movements along the D. T. Tracks in the Duluth area were movements of transfer trains within the doctrine of the three prior cases, and were not switching operations exempt from the Act. The Supreme Court found it "material" that the tracks crossed two streets at grade; five tracks of other railroads, one of which carried passenger trains; and that, for a distance of about one mile, two other railroad companies, [254 U.S. 251, 41 S.Ct. 102] "under the usual traffic right agreements," also used the D. T. Tracks for delivering cars to consignees. Although, at two intermediate points along the D. T. Tracks there were 9 and 6 tracks, respectively, where cars were frequently set out or picked up by the transfer trains, the Court noted that the two movements in question were accomplished without stops. The fact that on other occasions the locality was used for switching operations was not permitted to outweigh the fact that at the times under inquiry, no stops were made to switch cars. In our case, not only were there no such stops but, as before mentioned, three of the runs were begun with the fore-knowledge that no stopping or switching would be required.

In answer to the argument that the trains were not operated on a main line, Justice Brandeis stated that if use of a main line were essential, the requirement would be satisfied by the presence of other freight trains, quoting the lan-

guage of Justice Van Devanter in the Chicago, Burlington & Quincy R. Co. case that the defendant's trains and those of other railroads "which the statute was equally designed to protect," "were exposed to the hazards which that provision was intended to avoid or minimize." 254 U.S. 254, 41 S.Ct. 102. "But," continued Justice Brandeis, "there is nothing in the act which limits the application of the provision here in question to operations on main line tracks." Thus he made it plain that even if there had been no other trains using the tracks, the legal result would have been the same. The inescapable rationale of the four Supreme Court cases, as developed and refined in the Northern Pacific Ry. Co. case, is that transfer movements, even of the nature shown here (to and from industrial and commercial consignees), and even on tracks specially used for that purpose, are train movements subject to the airbrake provisions of the Act if they are not accompanied by the picking up and delivery of cars en route (which would necessitate the frequent coupling and uncoupling of air hoses), and if there is an exposure to the hazards which the Act was designed to avoid or minimize.

Our inquiry should then turn to discover the purposes of the Act and to examine whether the existing factual circumstances involve the dangers sought to be avoided.

In Louisville & Jeffersonville Bridge Co., Justice Clarke stated that it is the purpose of the Act to secure the "safety of employés, of passengers and of the public. * * *" 249 U.S. 534, 538, 39 S.Ct. 355, 357. In distinguishing between "passengers" and "the public," the Court made it clear that, as interpreted by them, the Act was designed to extend protection to more than employees and users of railroads. Viewing the general public as direct and not incidental beneficiaries of the Act's provisions, the topographical setting of the Hopewell area, especially the presence of intersecting streets and railroads, comes into

focus as an essential element in determining the issue whether the activities involved are "train movements."

Passing to the details of the territory through which the questioned movements were made, it should first be noted that a number of tracks of the Norfolk and Western Railway cross those of Seaboard at grade, and the Norfolk and Western, which also maintains tracks similar to Seaboard's here and which parallel Seaboard's, uses the intersecting tracks to make deliveries of cars to the various industries along the route. Moreover, according to the testimony of Mr. Roy E. Kean, Seaboard's assistant superintendent at Richmond, engines of the Norfolk and Western Railway and the Allied Chemical and Dye Company, as well as those of the defendant, operate over the defendant's tracks in the vicinity of Allied Chemical and Dye for a short distance.

In addition to private road crossings, five public streets intersect the defendant's tracks. One, known as DuPont Street, is the means of access to Allied's plant. Another, Terminal Street, is the situs of the headquarters and main fire station of the Hopewell Fire Department, which also houses automotive equipment of the Hopewell Emergency Squad. The evidence showed that vehicles of the Fire Department have occasion to use the Terminal Street intersection, although there was no direct evidence of there having been interference, by the defendant, with the passing of their vehicles. Randolph Street, also known as Virginia State Route 10, is the main automobile route between Richmond and Norfolk. It is a "heavily travelled" road, and at the point where it crosses the Seaboard tracks, there is a sharp curve which materially restricts visibility of railroad cars approaching the crossing from either direction. While it is true that the crossing is protected by manually operated gates, the Supreme Court in Louisville & Jeffersonville Bridge Co. declared that the very presence of gates at street crossings "serve[s] to empha-

size the dangerous character of the movement." 249 U.S. 534, 539, 39 S.Ct. 355, 357.

Palm Street and Hopewell Street also cross the Seaboard tracks, and the latter leads to the Hercules Powder Company plant, described in the testimony as a "relatively large plant." These two intersections have been the scenes of four collisions with automobiles since 1941, and three of them involved trains not having their airbrakes in operation.

Although the Randolph Street intersection is the only one protected with more than stationary signs, as the District Judge found, traffic over the street crossings varies from moderate to heavy. The moderate traffic, which occurs at hours coinciding with the usual hours of the defendant's movements along the tracks, is by no means insubstantial.

The evidence, moreover, shows that Seaboard frequently operates its trains with a number of cars in front of the locomotive as well as behind it, thereby increasing the danger. Two of the movements in question here (counts 2 and 4) were made with 13 and 8 cars, respectively, ahead of the engine. Because the engineer's range of vision is consequently reduced, there is, in these situations, still more reason for requiring the use of airbrakes. J. R. Hoag, a retired I.C.C. inspector, who is employed by Seaboard as Safety Consultant, was sent to Hopewell to survey the area and, in a letter to Seaboard's General Superintendent, he wrote, " * * * in cases where any considerable number of cars, probably more than ten, are pushed ahead of the engine, then the air brakes should be coupled on those cars and a tail hose provided so the trainman on the leading car can control the movement in case of emergency." He also advised that "there is no question that where air brakes are coupled and in use on a cut of cars, quicker stops can be made from any speeds."

Since it appears that an important factor in the essential nature of the work done is the potential hazard to those whom the Act is designed to protect, and since the Act has been construed as having been designed to include the general public in its protection, the sum of the elements in this case makes it more than evident that Seaboard has violated the Safety Appliance Act as to at least three of the movements in question.

The majority opinion relies on several cases which, under facts similar to those before us, held the movements only switching operations, exempt from the requirements of the Act. Notable are three cases from the Seventh Circuit. In the first of these, United States v. New York, C. & St. L. R. Co., 1935, 77 F.2d 215, the Court cited Louisville & Jeffersonville Bridge Co. v. United States, 1919, 249 U.S. 534, 39 S.Ct. 355, 63 L.Ed. 757, as the closest Supreme Court case, and distinguished it on its facts. The Northern Pacific case, 254 U.S. 251, 41 S.Ct. 101, 65 L.Ed. 249, which is indistinguishable, was apparently overlooked. Fifteen years later, however, when United States v. Elgin, J. & E. Ry. Co., 7 Cir., 1950, 182 F.2d 1, was before that Court, Northern Pacific was cited to it, and the Seventh Circuit distinguished it on the basis of there having been two street crossings and five rail crossings at grade in Northern Pacific, whereas in Elgin, no public streets or other railroads were crossed at grade, only two private roadways. The third case, United States v. Chicago, Burlington & Quincy R. Co., 7 Cir., 1952, 199 F.2d 223, was decided two years after Elgin. Although in Chicago, Burlington & Quincy one of the questioned movements was a two-mile straight run which crossed two public streets at grade, and rode over a track used by two through trains passing between Eola and West Chicago, the Court nevertheless followed its decision in Elgin and held that it was only a switching movement. Again the indisputably contrary Northern Pacific case went undistinguished and unmentioned.

There is no need to labor over decisions irreconcilable with those of the Supreme Court, for it is our duty to follow the law as laid down by that body, and not the contrary holdings of other courts.

The Second Circuit, on the other hand, in United States v. South Buffalo R. Co., 2 Cir., 1948, 168 F.2d 948, held that the crossings of a private way in movements similar to those here was a sufficient element to render the movements those of "trains" within the meaning of the Act. Judge Augustus Hand, speaking for the Court, declared: "We think it undesirable for the courts by their decisions to enable railroads to eliminate safety appliances where hazards undoubtedly exist to some substantial degree and where the use of such appliance would insure increased protection." 168 F.2d 948, 952. The Second Circuit is, I think, in harmony with controlling authority.

I would affirm as to count 3, and reverse as to counts 1, 2 and 4.